IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JEREMY GAY as the Wrongful Death Personal
Representative of the ESTATE OF RODNEY
LYNCH, RHONDA LYNCH, Individually and
On Behalf of L.N.L., a Minor Child, SHENALE
LEANN TSO, Individually, MELANIE LYNN
LYNCH, Individually, and AMBER REE LYNCH,
Individually,

        Plaintiffs,

vs.                             Cause No. 1:21-CV-00604 JCH/KK

JUSTIN OLVERA, in his individual capacity,
ELIJAH BOWMAN, in his individual capacity,
CITY OF GALLUP, a Municipal Corporation
of the State of New Mexico and
GALLUP POLICE CHIEF FRANKLIN BOYD,

        Defendants.

## MOTION OF DEFENDANTS CITY OF GALLUP, ELIJAH BOWMAN, FRANKLIN BOYD AND JUSTIN OLVERA FOR SUMMARY JUDGMENT (QUALIFIED IMMUNITY RAISED AS TO FEDERAL CLAIMS)

        Come now Defendants, City of Gallup, Elijah Bowman and Franklin Boyd, by and

through their counsel of record, Mason & Isaacson, P.A. (Thomas Lynn Isaacson, appearing),

and Defendant Justin Olvera, by and through his counsel of record, YLAW, P.C. (Robert W.

Becker, appearing), and move for summary judgment as to the claims asserted against them.

Defendants Bowman, Boyd and Olvera raise the defense of qualified immunity as to the federal

claims.  Plaintiffs oppose the motion.

        As grounds for their motion, Defendants City of Gallup, Olvera, Bowman and Boyd state

the following.

## INTRODUCTION

This suit involves an attempt by Community Service Aides employed by the City of Gallup to transport an overly intoxicated person, Rodney Lynch ("Lynch"), to a Detoxification Center for his own safety and for the safety of others pursuant to the New Mexico Detoxification Reform Act, NMSA 1978, § 43-2-10 et seq. Lynch was found to be visibly intoxicated at the Gallup Mall after persons had called 911 about him.

Police Recruit Elijah Bowman ("Bowman") was acting as a Community Service Aide on the date in question. Bowman responded to the Gallup Mall and attempted to obtain Lynch's compliance to enter a transport van for transportation to the Detox Center. Lynch resisted but later ceased resistance when a uniformed Gallup Police Officer responded and interceded.

Lynch entered the transport van but once inside began to pound his fist into the floor of the van and his other hand, as well as swing his arms in a boxing motion, stating that he was a championship boxer and would fight as soon as he got to the Detox Center. Due to Mr. Lynch's size and combative nature, Bowman had his ride along, Vincente Pete ("Pete"), contact Community Service Aide Justin Olivera ("Olvera") to meet them at the Detox Center.

Upon arrival at the Detox Center, Bowman advised Olvera that Lynch stated he wanted to fight, and that Bowman did not want to deal with Lynch. Olvera opened the back of the transportation van to get Lynch out of the van. Upon exiting the van, Lynch raised his left arm and hand as if he was going to strike Olvera. In an attempt to gain control of Lynch, Lynch was taken to the ground. Lynch resisted producing his hands so he could be handcuffed. Staff members of the Detox Center tried to assist, to no avail. Sergeant Nicola Martinez-Collins ("Martinez-Collins") then arrived and also attempted to assist in gaining control of Lynch.

Lynch was able to be handcuffed. But during the struggle to gain control of Lynch, Martinez-Collins became aware that Lynch was suddenly non-responsive. Lynch was unhandcuffed, rolled over, CPR was initiated, and EMS called to the scene. Lynch lost his pulse while the EMTs were on scene, regained his pulse and was transported by the EMTs to a hospital. Lynch never regained consciousness at the hospital and passed away three days later.

In the Complaint, Plaintiffs allege that Olvera utilized a choke hold in order to subdue Mr. Lynch. (Doc. 17, Preliminary Statement, ¶ 19). The autopsy report, however, reveals no injury to Lynch's throat or neck. According to the autopsy report, Lynch suffered a lethal heart arrythmia due to physiologic stress brought on by physical restraint. Lynch, however, brought the restraint on himself by his actions. Moreover, his morbid obesity, dilated cardiomyopathy and acute alcohol intoxication contributed to his death according to the findings of the Medical Investigator.

While Lynch's death is unfortunate, he was not subject to excessive force according to clearly established law. Bowman and Olvera are, thus, entitled to qualified immunity from suit as to the federal claims asserted against him. Without an underlying constitutional violation, the federal claims against Chief Franklin Boyd ("Boyd") and the City of Gallup fail.

As to any state law claims for loss of consortium, Community Service Aides are not considered "law enforcement officers" under the New Mexico Tort Claims Act. Community Service Aides have no arrest powers. They do not hold in custody persons accused of crimes as public drunkenness is not a crime in New Mexico. Their principal duties do not include maintaining public order in the traditional law enforcement sense, but rather picking up intoxicated persons for their personal safety. Bowman and Olvera are thus immune from liability under the New Mexico Tort Claims Act and without an underlying tort which is actionable under

the Tort Claims Act, any loss of consortium claims against the City of Gallup and Chief Boyd would likewise not be actionable. For these reasons, the Court should grant Defendants' motion and dismiss all claims asserted in this lawsuit.

## STANDARD OF LEGAL REVIEW

### A.    Legal Standard for Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ P. 56(a). The moving party "bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (citing to *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986)). The burden then shifts to the opposing party to the motion who "must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (citing to *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991)).

Whereas here, the events forming the basis of the lawsuit have been recorded, the Court views a motion for summary judgment in the light most favorable to the recording. *Scott v. Harris,* 550 U.S. 372, 380-81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). If no rational juror could award the plaintiff a recovery in the light most favorable to the recording, entry of summary judgment is appropriate. *Id.*.

### B.    Legal Standard for Qualified Immunity

Qualified immunity adds an extra layer of analysis to a motion for summary judgment. The qualified immunity doctrine applies to public officials acting in their individual capacities. *Brandon v. Holt*, 469 U.S. 464, 472-73 (1985). Under the doctrine, public officials are immune

from suit unless they have "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *City & Cnty. of San Francisco v. Sheehan,* 135 S.Ct. 1765, 1774 (2015) (internal citation omitted).

A right is not clearly established unless the "'right's contours were sufficiently definite [such] that every reasonable official in [the defendant's] shoes would have understood that he was violating it,' meaning that 'existing precedent…placed the statutory or constitutional question beyond debate." *Id.* (citing to *Ashcroft v. al-Kidd*, 131 S.Ct. 2074 (2011)). Where a defendant has asserted qualified immunity, a plaintiff seeking to overcome the defense "must satisfy a heavy two-part burden by showing: (1) the defendant violated a constitutional or statutory right, and (2) the right was 'clearly established' at the time of the conduct in question." *Mecham v. Frazier*, 500 F.3d 1200, 1204 (10th Cir. 2007). If the plaintiff fails to carry either part of the two-part burden, the defendant is entitled to qualified immunity. *Albright v. Rodriquez,* 51 F.3d 1531, 1535 (10th Cir. 1995). The court may evaluate either prong first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The "clearly established" prong of the qualified immunity test is a very high burden for a plaintiff. "A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S.Ct. at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle v. Howards*, 132 S. Ct. at 2093 (quoting *Ashcroft v. al-Kidd,* 131 S.Ct. at 2083).

The Tenth Circuit recognizes that courts "must scrupulously adhere to our longstanding duty to ascertain clear law (clear answers) that would apply to the situation at hand." *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015). And in recent years the Supreme Court has:

> . . . repeatedly told courts . . . not to define clearly established law at a high level of generality. The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.

*Mullenix v. Luna*, 136 S.Ct. 305, 308, 193 L.Ed. 2d 255, 259 (2015) (citations and internal quotation marks omitted). This sentiment was re-emphasized by the Supreme Court in *White v. Pauly*, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017), and in the Supreme Court's per curiam opinion in *City of Escondido v. Emmons,* 139 S.Ct. 500, 503 (2019), where the Court stated emphatically:

> Under our cases, the clearly established right must be defined with specificity. 'This Court has repeatedly told courts. . . not to define clearly established law at a high level of generality.' *Kisela v Hughes*, 584 U.S. __, 138 S.Ct. 1148, 1152 (2018).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On June 28, 2019, Justin Olvera ("Olvera") was acting as a Community Service Aide employed by the City of Gallup. Amended Complaint, Doc. 17, ¶ 9.

2.      On June 28, 2019, Elijah Bowman ("Bowman") was acting as a Community Service Aide employed by the City of Gallup, even though the City of Gallup had initially hired him as a Police Officer Recruit. Amended Complaint, Doc. 17, ¶ 10; Declaration of Franklin Boyd at Exhibit 1, ¶¶ 3-5.

3.      According to the job description for a Community Service Aide, their general purpose is to '[p]rotect life and property through the enforcement of federal, state and local laws

dealing with protective custody." A Community Service Aide "patrols an assigned area on foot or by motorized vehicle, for the purpose of picking up intoxicated persons for their personal safety." Community Service Aide Job Description at Exhibit 2

4.     A Community Service Aide has no arrest powers and does not hold in custody persons accused of crimes. A Community Service Aide's essential duties include: (1) patrolling a designated area on an assigned shift in a cruiser, panel truck or on foot; (2) checking individuals who are inebriate and deciding whether transporting them to the Detoxification Center is warranted; (3) if medical treatment is necessary, dispatching an ambulance to transport unconscious or hurt individuals to a local hospital; (4) assisting and/or carrying individuals to a vehicle for transport; (5) performing duties through visual observation of intoxicated persons or through telephone reports received from the general public or from business establishments; (6) and providing general information to the public. They are required to work long hours, sometimes on a holiday, and are on call to cover a shift when needed. Community Service Aide Job Description, Exhibit 2. See also Boyd Declaration, Exhibit 1, ¶¶ 6-10 and Declaration of Elijah Bowman at Exhibit 3, ¶ 3.

5.     On June 28, 2019 at approximately 7:16 p.m., Bowman was dispatched to the JC Penny store at the Rio West Mall in Gallup in reference to a male subject, later identified as Rodney Lynch, who was reportedly visibly intoxicated. Bowman Declaration, Exhibit 3, ¶ 6; CAD Report at Exhibit 4; Deposition of Elijah Bowman at Exhibit 5, p. 21:l.22-p. 22:l.9.

6.     Bowman had a ride along with him at the time by the name of Vincent Pete. Bowman Declaration, Exhibit 3, ¶ 13; Deposition of Elijah Bowman, Exhibit 5, p. 42:l.21- p. 43:l.17; Declaration of Vincent Pete at Exhibit 6, ¶ 3.

7.      Bowman responded to the call in a transport van with Pete.  Bowman Declaration, Exhibit 3, ¶ 4; Bowman Deposition, Exhibit 5, p. 21:l.18-p.23:l.12; Pete Declaration, Exhibit 6, ¶4. The van's video recording system was on and operational at the time. Bowman Declaration, Exhibit 3, ¶ 4, and attached Video Recording thereto at 19:23:26-19:23:46.

8.      When the pair arrived at the mall, Bowman observed two security guards with Lynch at the JC Penney store. Bowman parked the transport van nearby.  He exited the transport van and made contact with Lynch.  Bowman Declaration, Exhibit 3, ¶¶ 7-8 and Video Recording at 19:23:46-19:23:50; Bowman Deposition, Exhibit 5, p. 23:ll.16-23; Pete Declaration, Exhibit 6, ¶ 4.

9.      The mall security guards were with Lynch.  Lynch was walking toward Metro Avenue. Bowman Declaration, Exhibit 3, ¶ 7; Bowman Deposition, Exhibit 5, p. 25:ll. 10-20.

10.     Bowman approached Lynch.  He smelled of alcohol, was visibly intoxicated and had a bottle of alcohol with him. Bowman Declaration, Exhibit 3, ¶ 8; Bowman Deposition, Exhibit 5, p. 26:ll.2-6; p. 34:l.16 - p.35:l.2.

11.     Lynch was advised by Bowman to get off of the road and walk to his van.  Lynch would not walk to the transport van and said he was going to walk to his home near Window Rock. Bowman Declaration, Exhibit 3, ¶ 9; Bowman Deposition, Exhibit 5, p. 30:ll.11-17.

12.     Lynch became argumentative.  Bowman Deposition, Exhibit 5, p. 32:ll.9-18 and Video attached to Bowman Declaration, Exhibit 3, at 19:26:16 – 19:26:17. At one point, Lynch told Bowman not to touch him or he (Lynch) would "knock [Bowman] out." Pete Declaration, Exhibit 6, ¶ 5.

13.     Lynch walked away from Bowman, waiving his arms.  Bowman grabbed Lynch by his arms to prevent him from walking away. Bowman Declaration, Exhibit 3, ¶ 9 and Video, at 19:26:26 – 19:26:28.

14.     Mall security officers were walking behind Bowman and Lynch. They tried to assist Bowman to gain Lynch's compliance to get in the transport van. Bowman Declaration, Exhibit 3, ¶ 9 and Video at 19:26:26 – 19:26:42.

15.     Bowman and one of the security officers tried to get control of Lynch's arms to get Lynch to walk to the transport van.  Bowman Declaration, Exhibit 3, ¶ 10 and Video at 19:26:26-19:26:42.

16.     Bowman tried repeatedly to gain Lynch's compliance to walk with Bowman to the transport van.  Bowman Declaration, Exhibit 3, ¶ 10 and Video at 19:26:24-19:27:01.

17.     Lynch refused, went to his knees on the sidewalk, and struggled with Bowman and the security officer. Bowman Declaration, Exhibit 3, ¶ 10 and Video at 19:27:01 – 19:27:54; Pete Declaration, Exhibit 6, ¶¶ 6-7.

18.      Bowman called for a police officer to assist him and continued to try and reason with Lynch. Bowman Declaration, Exhibit 3, ¶ 11 and Video at 19:27:54-19:28:15.

19.     Lynch eventually rolled over and sat on the curb. Video attached to Bowman Declaration, Exhibit 3, at 19:28:15-19:28:55.

20.     Bowman tried to grab hold of Lynch's right arm to get him up to escort him to the transport van.  Mr. Lynch resisted.  Video attached to Bowman Declaration, Exhibit 3, at 19:28:56-19:28:58.

21.     Gallup Police Officer Joe Roanhorse ("Roanhorse"), who had been dispatched to the mall, arrived on scene.  By this time, Lynch had calmed down and was sitting on the curb. Bowman Declaration, Exhibit 3, ¶ 11 and Video at 19:28:58-19:29:16.

22.     Roanhorse talked with Lynch, grabbed his left arm, and with Bowman holding on to Lynch's right arm by the right wrist, the pair lifted Lynch off the sidewalk.  Bowman Declaration, Exhibit 3, ¶ 11 and Video at 19:29:17-19:29:44.

23.     Roanhorse and Bowman escorted Lynch to the transport van. Bowman Declaration, Exhibit 3, ¶ 11 and Video at 19:29:45-19:30:01; Pete Declaration, Exhibit 6, ¶ 7.

24.     Lynch was placed in the back of the transport van.  Bowman then talked with one of the security officers who advised Bowman that Lynch had raised his arm to strike Bowman. Officer Roanhorse walked to his patrol vehicle, entered and drove away.  Bowman Declaration, Exhibit 3, ¶¶ 11-12 and Video at 19:30:43-19:32:58; Pete Declaration, Exhibit 6, ¶ 7.

25.     Once inside the back of the secure area of the transport van, the back door of the van was closed.  Video attached to Bowman Declaration, Exhibit 3, at 19:31:04.

26.     Lynch was seated on the floor of the van.  He was breathing heavy and readjusted his position on the floor of the van.  Video attached to Bowman Declaration, Exhibit 3, at 19:31:05-19:32:06.

27.     While breathing heavily, Lynch raised his right arm repeatedly, verbalized something and spit on the side walls of the van.  Video attached to Bowman Declaration, Exhibit 3, at 19:32:06-19:32:45.

28.     Lynch then pounded his right fist into the floor of the van four (4) times.  Video attached to Bowman Declaration, Exhibit 3, at 19:33:12-19:33:15.  He then began pounding his right fist into the palm of his left hand, slapping his right hand into the palm of his left hand and

swinging his arms in a boxing motion.  Video attached to Bowman Declaration, Exhibit 3, at 19:33:19-19:34.17.

29. Pete, who was in the transport van at the time, heard and observed Lynch's actions.  He also heard Lynch state that he was a championship boxer and that he was going to punch whoever let him out of the van.  Pete Declaration, Exhibit 6, ¶ 8.

30. When Bowman returned to the van, Pete advised Officer Bowman what he observed and what he had heard Lynch state.  Pete Declaration, Exhibit 6, ¶ 9.

31. Bowman and Pete transported Lynch to the NCI Detox Center in Gallup.  While they were enroute, Bowman directed Pete to text Justin Olvera to meet them at the Detox Center, because Lynch was a large man, said he wanted to fight, and he did not want to have to deal with Mr. Lynch alone.  Bowman Declaration, Exhibit 3, ¶ 15; Pete Declaration, Exhibit 6, ¶ 10.

32. Bowman and Pete arrived at the Detox Center with Lynch.  Olvera arrived shortly thereafter. Bowman spoke to Olvera, explained what had occurred at the Gallup Mall outside the JC Penney Store, advised that Lynch was bigger than him, was a "wrestler," and had expressed a desire to fight once outside the van. Bowman Declaration, Exhibit 3, ¶ 16 and Video at 20:00:48-20:03:02.[1]

33. Bowman then backed his transport van into the sallyport area.  Pete exited Bowman's transport van and was instructed to enter the Detox Center.  Authenticated Camera 29, 19:52:35-19:53:36 and Camera 31, 19:52:33-19:53:38, Video Footage from NCI Detox Center, collectively at Exhibit 7. See also Pete Declaration at Exhibit 6, ¶ 11.

34. Olvera opened the back of Bowman's transport van, retrieved a bottle of alcohol from the van that Lynch had at the time he was placed in the van, and brought it into the Detox

---

[1] Bowman recalls Pete stating that Lynch said he was a wrestler while Pete states that he told Bowman that Lynch said he was a boxer.

Center.  Camera 29, 19:54:01-19:54:24 and Camera 31, 19:54:02-19:54:23, Video Footage, Exhibit 7.

35.     Olvera returned to the back of Bowman's van and shined his flashlight into the back. He opened the secure cage inside the back.  He requested that Lynch exit the van. Bowman Declaration Exhibit 3, ¶ 17; Camera 29, 19:54:35-19:55:13 and Camera 31, 19:54:35-19:55:11, Video Footage, Exhibit 7.

36.     Lynch paused but eventually placed his feet outside the van.  Once he put both of his feet on the concrete pad, he raised his left hand and arm toward Olvera's face.  Camera 31 Video Footage, Exhibit 7, at 19:55:15-19:55:17.

37.     In response, Olvera grabbed Lynch.  Olvera and Bowman then struggled with Lynch and he was taken the ground in order to gain control of him.  Bowman Declaration, Exhibit 3, ¶ 18; Pete Declaration, Exhibit 6, ¶ 11, Camera 31 Video Footage, Exhibit 7, at 19:55:22.

38.     Lynch maintained his hands underneath him, preventing Olvera and Bowman from handcuffing Lynch for their safety.  Staff members of the Detox Center assisted Bowman and Olvera in trying to get Lynch's hands from underneath him so he could be handcuffed. Camera 31 Video Footage, Exhibit 7, at 19:55:24-19:56:20.

39.     Gallup Police Sergeant Nicola Martinez-Collins then arrived. She also assisted in attempting to get Lynch handcuffed.  Camera 31 Video Footage, Exhibit 7, at 19:56:20-19:56:53; Deposition of Nicola Martinez-Collins at Exhibit 8, p. 46:l.1-p. 49:l.25.

40.     Lynch was handcuffed. Martinez-Collins instructed Community Bowman and Olvera to turn Lynch over, at which point, it appeared that Lynch was unresponsive.  Camera 31

Video Footage, Exhibit 7, at 19:56:53-19:57:46; Martinez-Collins Deposition, Exhibit 8, p. 50:ll.1-6.

41.     Lynch was uncuffed. CPR was initiated by Martinez-Collins.  Another officer, who had also arrived on scene, took over CPR when Martinez-Collins tired. Bowman Deposition, Exhibit 5, p. 71:l.6 - p.72:l.23; Camera 31 Video Footage, Exhibit 7, at 19:57:47-19:58:33; Martinez-Collins Deposition, Exhibit 8, p. 50:l.15-p.51:l.2.

42.     Staff at the Detox Center began to prepare an AED to be used on Lynch.  CPR was initially stopped but then continued.  Camera 31 Video Footage, Exhibit 7, at 19:58:49-19:59:40; Martinez-Collins Deposition, Exhibit 8, p. 51:ll.6-23.

43.     CPR efforts were continued on Lynch until EMTs from the Fire Department arrived.  Upon arrival, EMTs used their own AED on Lynch and also assumed performing compressions on Lynch's chest.  Camera 31 Video Footage, Exhibit 7, at 19:59:56-20:16-47; Martinez-Collins Deposition, Exhibit 8, p. 51:l.24-p. 52:l. 8; EMS Report at Exhibit 9.

44.     EMTs were able to obtain a pulse from Lynch.  Chest compressions were ceased. Lynch's pulse was lost, however. Chest compressions were reinitiated, and a pulse was again obtained from Lynch.  Lynch was then placed on a backboard and transported from the Detox Center.  Camera 31 Video Footage, Exhibit 7, at 20:16:47-20:22:07; EMS Report, Exhibit 9.

45.     Lynch was transported to a hospital.  He lived for several days in an unconscious state but passed away on July 2, 2019. EMS Report, Exhibit 9; Doc. 17, Preliminary Statement.

46.     An autopsy concluded that Lynch died of complications of physical restraint with other significant contributory conditions being Lynch's morbid obesity, his dilated cardiomyopathy and his acute alcohol intoxication.  No injury was noted to Lynch's neck or throat. Autopsy Report at Exhibit 10.

47.     Suit was initially filed in state district court on August 11, 2020 in McKinley County. Only state law claims were asserted in that suit, which is still pending, and for which Plaintiffs have served written discovery and taken seven (7) depositions. State District Court Docket Report at Exhibit 11.

48.     On June 30, 2021, the Plaintiffs, to wit, Lynch's wrongful death estate; his wife; and his children, brought suit in this court, alleging Fourth Amendment claims on behalf of the wrongful death estate for excessive force against Olvera and Bowman pursuant to 42 U.S.C. § 1983. Specifically, Plaintiffs allege that Lynch died due to a choke hold by Olvera. Claims for municipal and supervisory liability were asserted on behalf of the wrongful death estate against the City of Gallup and Chief Franklin Boyd pursuant to 42 U.S.C. § 1983. Additionally, Lynch's wife and children brought individual state law claims for loss of consortium against all Defendants. Docs. 1 and 17 (Preliminary Statement).

**ARGUMENT**

I.      **Bowman and Olvera are Entitled to Qualified Immunity as
        to Count I of the Complaint, Alleging Excessive Force in Violation
        of the Fourth Amendment to the United States Constitution.**

The transport of an intoxicated person to a Detox Center constitutes a seizure governed by the Fourth Amendment. *See, e.g., Novitsky v. City of Aurora,* 491 F.3d 1244 (10th Cir. 2007). "[A]ll claims that … officers have used excessive force [in violation of the Fourth Amendment] – deadly or not – in the course of an investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness standard'. This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 822, 172 L.Ed. 2d 565 (2009).

"Reasonableness is evaluated under a totality of the circumstances approach, which requires that [a court] consider and balance the following factors:  the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1313 (10th Cir. 2009), citing, *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).  The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  *Thomson*, *supra*, citing, *Graham v. Connor*, 490 U.S. 386, 396 109 S.Ct. 1865, 103 L.Ed.2d 443 (1989).  This is because [courts] recognize that officers may have 'to make split-second judgments in uncertain and dangerous circumstances.'"  *Id*., citing, *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005).

Public drunkenness is not a crime in New Mexico.  NMSA 1978 § 43-2-3- ("It is the policy of this state that intoxicated and incapacitated persons may not be subject to criminal prosecution, but rather should be afforded protection.").  Nevertheless, "individuals who are intoxicated are often unpredictable." *Novitsky*, 491 F.3d at 1255, citing, *Bing v. City of Whitehall*, 456 F.3d 555, 564 (6th Cir. 2006) (noting that reports regarding an individual who "appeared intoxicated, ma[de] it reasonable for [officers] to expect he would act unstably.").

The safety of Olvera and Bowman in dealing with Lynch is a weighty concern in the objective reasonableness analysis. *Novitsky*, 491 F.3d at 1254, citing, *Pennsylvania v. Mimms*, 434 U.S. 106, 110 98 S.Ct. 330, 54 L.Ed.2d 33 (1977) ("It is beyond dispute that the safety of law enforcement officers during the performance of their duties is a 'legitimate and weighty' concern.").  Lynch was a large and strong man.  He actively resisted Bowman's attempt to place

him in the transport van for transport to the Detox Center, necessitating a uniformed police officer, Roanhorse, interceding to obtain Lynch's compliance.

Once in the transport van, Lynch pounded the floor of the van, pounded his right fist into his left palm, swung his arms in a boxing motion and stated that he was a championship boxer and would assault whoever got him out of the van. This was observed and overhead by a ride-along, Pete, who conveyed what he observed and overheard to Bowman. The transport van's recording system captured all of Lynch's activities in the back of the transport van.

Once they reached the Detox Center, Bowman advised Olvera what occurred at the Gallup Mall, what Pete had observed from Lynch, and that Lynch had expressed a desire to fight whoever was going to let him out of the van. Upon exiting the back of the van, Lynch made an aggressive move with his left arm and hand towards Olvera's face. Based on the totality of these circumstances, Olvera and Bowman, who was standing next to Olvera, were entitled to protect their safety by forcing Lynch to the ground in order to handcuff him. *Novitsky*, 491 F.3d at 1254, citing, *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) (collecting cases) ("Under certain circumstances, the steps officers may permissibly take to protect their safety include drawing their weapons, placing a subject in handcuffs, or forcing a suspect to the ground."). It was also reasonable for Olvera to believe that Lynch intended to fight him when Lynch raised his left arm and hand toward Olvera's face. Bowman had advised Olvera that Lynch had expressed an intention to fight the person who got him out of the van when he reached the Detox Center. Consequently, the force used on Lynch was objectively reasonable. *Estate of Larsen*, 511 F.3d at 1260, quoting, *Saucier v. Katz*, 523 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 ("Indeed, even if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, the

officer would be justified in using more force than in fact was needed."); *Thomson,* 584 F.3d at 1315, citing, *Estate of Larsen* (same).

It is unfortunate that Lynch passed away several days later but the fact of his death, in and of itself, does not establish a constitutional violation. Bowman's and Olvera's use of force was objectively reasonable under the totality of the circumstances. Analyzing their motion in the light most favorable to the recording of the encounter (*Scott*, *supra; see also, e.g., City of Tahlequah, Ok. v. Bond as Special Administrator of the Estate of Rollice,* 595 U.S. ___, No. 20-1668 (October 18, 2021) (analysis of an excessive force case based on police body-camera footage)), they are, thus, entitled to qualified immunity as to Count I of the Complaint, alleging they violated Lynch's Fourth Amendment rights. *Graham*, 490 U.S. at 397 ("An officer using force in the course of a seizure of a citizen is entitled to qualified immunity unless the level of force violated clearly established Fourth Amendment law.").

**II.     Counts IV and V of the Complaint, Alleging Loss of Consortium, Fail Because Plaintiffs Cannot Prove an Underlying Tort for Which Immunity Has Been Waived Under the New Mexico Tort Claims Act.**

In *Brenneman v. Board of Regents of University of New Mexico*, 2004-NMCA-003, 135 N.M. 68, 84 P.3d 685, the New Mexico Court of Appeals recognized the existence of loss of consortium as a viable claim under the New Mexico Tort Claims Act when suffered by a third party who stands in a certain relationship to the tort victim. The Court of Appeals characterized loss of consortium as a derivative claim, however, meaning that where a defendant is not liable to the tort victim, there can be no derivative claim for loss of consortium. *See*, *e.g.*, *Brenneman*, 2004-NMCA-003 at ¶ 9, citing, *Archer v. Roadrunner Trucking, Inc.,* 1997-NMSC-003, ¶¶ 11-12, 122 N.M. 703, 930 P.2d 1155 (holding that "[where] the defendant is not liable to the injured person for physical injuries there can be no derivative claim for [loss of consortium] damages by

the injured person's spouse."). Thus, in the context of this suit, the individual Plaintiffs may not maintain claims for loss of consortium against Bowman and Olvera if the Estate of Lynch does not have a viable claim against them for which immunity has been waived for Lynch's alleged wrongful death.

As public employees of a governmental entity acting in the scope of their lawful duties, Bowman and Olvera enjoy the protections of the New Mexico Tort Claims Act, NMSA 1978, § 41-4-1 et seq. The New Mexico ("TCA") is a creature of statute. The Legislature recognized, in enacting the TCA, that *"government should not have the duty to do everything that might be done. Consequently, it is declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in the act."* NMSA 1978, § 41-4-2A.

Courts have recognized the right to sue government and its employees acting in the course of their lawful duties is a statutory right and the legislature's authority to reasonably restrict that right. *See Marrujo v. New Mexico State Highway Transp. Dept.,* 1994-NMSC-116, ¶ 24, 118 N.M. 753, 887 P.2d 747. As held by our Supreme Court, "[t]he legislature never intended government and private tortfeasors to receive identical treatment." *Id*. Thus, "under New Mexico law, if no <u>specific</u> waiver can be found in the New Mexico Tort Claims Act, a plaintiff's complaint for damages against a governmental entity or its employees must be dismissed." *Pueblo of Pojoaque v. New Mexico*, 214 F.Supp.3d 1029, 1087 (D.N.M. 2016).

The scheme enacted by the Legislature revived the concept of sovereign immunity as an overriding principle after the Supreme Court abolished it in 1975, except in eight (8) areas. *See e.g., Bierner v. City of Truth or Consequences*, 2004-NMCA-093, ¶ 10, 136 N.M. 197, 199, 96 P.3d 322, 324 ("Section 41-4-4(A*)* of the TCA provides government entities with immunity from

liability for any tort, except as waived in other sections of the TCA.")  Exceptions to the TCA's

general rule of immunity are strictly construed.  *Kreutzer v. Aldo Leopold High School*, 2018-

NMCA-005, ¶ 51, 409 P.3d 930, 941, citing, *Rutherford v. Chaves County*, 2003-NMSC-010, ¶

11, 133 N.M. 756, 69 P.3d 1199.  Unless a plaintiff can fit his or her claim within one of the

waivers of sovereign immunity, a governmental entity and its employees are immune from

liability.  *See*, *Upton v. Clovis Municipal School District*, 2006-NMSC-040, ¶ 29, 140 N.M. 205,

141 P.3d 1259 ("the rule is immunity, waiver is the exception.").  There are eight (8) waivers of

sovereign immunity under the TCA pertaining to operation or maintenance of motor vehicles,

aircraft and watercraft (NMSA 1978, § 41-4-5); operation or maintenance of buildings, public

parks, machinery, equipment and furnishings (NMSA 1978, § 41-4-6); operation of airports

(NMSA 1978, § 41-4-7); operation of public utilities and services (NMSA 1978, § 41-4-8);

operation of medical facilities (NMSA 1978, § 41-4-9); negligence of health care providers in

providing health care services (NMSA 1978, § 41-4-10); construction and subsequent

maintenance of highways and streets (NMSA 1978, § 41-4-11); and certain enumerated acts by

law enforcement officers (NMSA 1978, § 41-4-12).

The only applicable waiver here would be the waiver of immunity for "law enforcement

officers" pursuant to Section 41-4-12 of the Tort Claims Act. A "law enforcement officer" is

defined as a full-time salaried public employee of a governmental entity, or a certified part-time

salaried police officer employed by a governmental entity, whose principal duties under law are

to hold in custody any person accused of a criminal offense, to maintain public order or to make

arrests for crimes, or members of the national guard when called to active duty by the governor."

NMSA 1978, § 41-4-3D.

Recently, the New Mexico Court of Appeals held that public service officers (PSOs) performing duties under the Detoxification Act are not "peace officers" as defined by New Mexico law. *State v. Becenti*, ____ P.3d ____, 2021 WL 3825209 (Ct. App. August 24, 2021). In reaching this decision, the Court of Appeals cited several Tort Claims Act cases such as *Baptiste v. City of Las Cruces*, 1993-NMCA-017, 115 N.M. 178, 848 P.2d 1105; *Vigil v. Martinez*, 1992-NMCA-033, 113 N.M. 714, 832 P.2d 405; *Anchondo v. Corr. Dep't*, 1983-NMSC-051, 100 N.M. 108, 666 P.2d 1255; and *Limacher v. Spivey*, 2008-NMCA-163, 145 N.M. 344, 198 P.3d 370, and concluded that given the policy of the Detoxification Reform Act, NMSA 1978 § 43-2-1.1 to 2-23, that "intoxicated and incapacitated persons may not be subject to criminal prosecution but rather should be afforded protection," Further, PSOs' principal duties are not maintenance of public order in the traditional law enforcement sense. They are, therefore, not "peace officers" for which a charge of battery on a peace officer can be maintained. *Becenti*, 2021 WL 3825209 at **2-4.

Here, Community Service Aides are the functional equivalent of the public service officers described in *Becenti*. They do not hold in custody persons accused of criminal offenses, they have no arrest powers, and their principal duties are not to maintain public order in the traditional law enforcement sense. Instead, their principal duty is "picking up intoxicated persons for their personal safety". *Becenti*, supra. They are, thus, not "law enforcement officers" for Tort Claims Act purposes, and are therefore immune from liability for Lynch's alleged wrongful death under state law. *Upton*, *supra*. Consequently, the individual Plaintiffs may not maintain derivative claims for loss of consortium against Olvera and Bowman because the underlying tort claim is not actionable. *Brenneman*, *supra*. Counts IV and V of the Complaint (Doc. 17), alleging loss of consortium, should therefore be dismissed with prejudice as a matter of law.

### III. Without an Underlying Constitutional Violation, the Plaintiffs have no Federal Claims Against the City of Gallup or Chief Boyd.

Claims against a municipality for municipal liability are not actionable in the absence of an underlying constitutional violation. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002), citing, *Hinton v. City of Elwood*, 997 F.3d 774, 782 (10th Cir. 1993). Likewise, a municipal police chief cannot be held "liable for constitutional violations when there is no underlying constitutional violation by any of [his] officers." *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009), quoting, *Olsen*, *supra*.

As stated previously in Argument I, Olvera and Bowman did not commit a constitutional violation against Lynch. As a consequence, no federal claims lie against the City of Gallup or Chief Boyd for municipal/supervisory liability. Counts II and III of Plaintiffs' Complaint, alleging municipal and supervisory liability, should therefore be dismissed as a matter of law.

### IV. State Law Claims for Loss of Consortium Against the City of Gallup and Chief Boyd Should be Dismissed as a Matter of Law in the Absence of an Underlying Tort for Which Immunity has been Waived as to Olvera and Bowman.

The state law claims for loss of consortium against the City of Gallup and Chief Boyd in Counts IV and V require an actionable tort against Olvera or Bowman for which immunity has been waived under the Tort Claims Act. *Gallegos v. State*, 1987-NMCA-150, ¶ 5, 107 N.M. 349, 758 P.2d 299, citing, *Abalos v. Bernalillo County District Attorney's Office*, 105 N.M. 554, 734 P.2d 794 (Ct. App. 1987). The loss of consortium claims asserted against the City of Gallup and Chief Boyd do not lie for the simple reason that immunity has not been waived for the loss of consortium claims against Olvera and Bowman. Therefore, any claims for loss of consortium asserted against the City of Gallup and Chief Bowman should be dismissed as a matter of law.

## CONCLUSION

For the reasons stated, the Court should grant summary judgment as a matter of law to the Defendants. All claims against them should be dismissed with prejudice, and this case closed on the Court's docket.

Respectfully submitted,

Mason & Isaacson, P.A.

**/s/ Thomas Lynn Isaacson**
Thomas Lynn Isaacson
*Attorneys for Defendants City of Gallup,*
*Franklin Boyd and Elijah Bowman*
104 E. Aztec Avenue
Gallup, NM 87301-6256
(505) 722-4463
tli@milawfirm.net

YLAW, P.C.

**/s/ Robert W. Becker**
Robert W. Becker
*Attorneys for Defendant Justin Olvera*
4908 Alameda Blvd NE
Albuquerque, NM 87113-1736
(505) 266-3995
rbecker@ylawfirm.com

**I HEREBY CERTIFY** that on the 29th day of October, 2021, I filed the foregoing electronically through the Odyssey filing system which caused the following parties to be served electronically:

William R. Keeler
Keeler & Keeler, LLP
*Attorneys for Plaintiff*
235 West Historic Highway 66
Gallup, NM 87301
(505) 722-5608
billkeeler@keelerandkeeler.com

*/s/ Robert W. Becker*