**11TH JUDICIAL DISTRICT COURT**
**COUNTY OF MCKINLEY**
**STATE OF NEW MEXICO**

CITY OF GALLUP, New Mexico, a
municipal corporation,

Plaintiff,

vs.

**No. D-1113-CV-2017-00284**

PHILLIP HART,

Defendant.

## BRIEF IN SUPPORT OF CITY OF GALLUP'S MOTION FOR SUMMARY JUDGMENT

Plaintiff City of Gallup ("Gallup" or the "City"), by and through its attorneys, Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A., hereby submits this Brief in Support of City of Gallup's Motion for Summary Judgment

### I.   INTRODUCTION

Since territorial days, New Mexico's Legislature has grappled with how to address health crises related to alcoholism. *See, e.g., State v. Correa*, 2009-NMSC-051, ¶¶ 7-8, 147 N.M. 291, 222 P.3d 1. From the mid 1800's, through the most recent revisions to the Detoxification Reform Act (the "DRA" or the "Act"), New Mexico's Legislature has moved away from criminalizing intoxication and towards the twin goals of protecting and treating citizens affected by alcoholism or drug addiction. *See* NMSA 1978, Sections 43-2-1.1 to -23 (1941, as amended through 2005), *see, e.g., Correa*, 2009-NMSC-051, ¶¶ 7-15. The current version of the DRA, revised most recently in 2005, explicitly identifies the policy of the State of New Mexico regarding drug and alcohol-impaired individuals:

It is the policy of this state that intoxicated and incapacitated persons may not be subjected to criminal prosecution, but rather *should be afforded protection*. It is

**Exhibit "A"**

further the policy of this state that alcohol-impaired persons and drug-impaired persons should be *afforded treatment* in order that they may lead normal lives as productive members of society.

NMSA 1978, § 43-2-3 (emphases added) ("Policy of state regarding substance abuse."). The Act specifically defines "treatment" to include "protective custody." Section 43-2-2(L).

The City of Gallup and the Gallup Police Department ("GPD") have for several years employed and utilized Community Service Aides ("CSAs") to carry out the provisions of the DRA. The CSAs travel Gallup's streets, surrounding arroyos, ditches, and fields, assisting alcohol-impaired individuals or those unable to care for themselves. *See* UMF Nos. 2-4. The CSAs aim to protect these individuals from the effects of alcoholism and drug addiction, including exposure to temperatures that plunge below freezing for seven (7) months out of the year. *See* Gallup, NM, U.S. Climate Data, *available at* https://www.usclimatedata.com/ climate/gallup/new-mexico/united-states/usnm0121, attached hereto as Exhibit 1; UMF Nos. 2-4. In order to afford protection and treatment to these individuals, CSAs transport the individuals, in marked Gallup Police Department vehicles, to Na'Nizhoozhi Center ("NCI"), the City's detoxification center for protective custody. *See* UMF Nos. 15, 35-36. NCI provides various treatment services to intoxicated individuals, including protective custody. *See* UMF Nos. 34-37.

In a State that consistently leads the nation in alcohol-related deaths, McKinley County suffers the second most alcohol-related deaths in New Mexico.[1] The CSA Program is part of a

---

[1] *See* New Mexico's Indicator-Based Information System (NM-IBIS), Graphical Data Views, Alcohol-related Death Rates By Year, New Mexico, 1990-2015 ("Rio Arriba and McKinley counties have the highest rates of alcohol-related death, with rates more than twice the state rate and more than three times the national rate."), *available at* https://ibis.health.state.nm.us/indicator/complete_profile/AlcoholRelatedDth.html (last visited, Aug. 8, 2017); Alcohol-related Deaths By County, 2011-2015 ("The consequences of excessive alcohol use are severe in New Mexico. New Mexico's total alcohol-related death rate has ranked 1st, 2nd, or 3rd in the U.S. since 1981; and 1st for the period 1997 through 2007 (the most recent year for which state comparison data are available)."), *available at* https://ibis.health.state.nm.us/indicator/view/AlcoholRelatedDth.Cnty.html (last visited, Aug. 8, 2017).

2

broader effort to help address complex issues related to alcoholism in Gallup and McKinley County. *See, e.g.,* Section 1115 Quarterly Report, New Mexico Human Services Department, (March 2016) (discussing the Gallup-McKinley County Behavioral Health Investment Zone goals related to detoxification and other therapies and services), attached hereto as Exhibit 2.

In June 2016, Defendant Phillip Hart, a retired DEA agent originally from Ohio, became the City's Chief of Police ("Chief Hart"). Before moving to Gallup, Chief Hart served as a DEA agent in Colorado and Washington State, at DEA headquarters in Virginia, and finally, before his retirement, in Albuquerque. On June 9, 2017, Chief Hart, through his attorney Johanna Cox, told the City that, in his opinion, the City's use of CSAs was not lawful under the DRA. *See* Exhibit B to the City's Complaint for Declaratory Judgment, D-1113-CV-2017-00284 (filed June 12, 2017). Chief Hart demanded $1.13 million dollars from the City to drop the issue and to resign as Chief of Police. *See id.*

Chief Hart has expressed "concerns with the CSA program as a whole, i.e. how a civilian employee [the CSA] of the GPD could take away the civil rights of an individual based on the Act." *See* Hart Answer to Interrogatory No. 2, attached hereto as Exhibit 3. And Chief Hart, through his attorney, asserted that "the detention, transport, and commitment of citizens by CSA agents is unlawful." *See* Exhibit B to the City's Complaint for Declaratory Judgment, D-1113-CV-2017-00284. Ms. Cox, also apparently informed members of the Gallup Police Department that both officers and CSAs could be held personally liable for following the City's protective custody procedures. *See* Kozeliski Memo to All Employees of the GPD (June 19, 2017), attached hereto as Exhibit 4 (attachments omitted). The specific authorities relied on by Chief Hart for his demands and these statements remain unclear.[2]

---

[2]  Chief Hart's failure to fully respond to the City's discovery directed at these precise issues necessitated the City filing a Motion to Compel. *See* City of Gallup's Motion to Compel Discovery Responses, at 2 (Oct. 3, 2017).

3

Applying New Mexico's statutory interpretation principles, CSAs fall within the categories of persons authorized to take reasonable steps under the DRA, including transporting individuals to NCI, and making written applications for an impaired individual's commitment to the NCI's protective custody unit. The CSA Program fulfills the Act's stated purpose to "afford[] protection" and "treatment" to alcohol-impaired individuals. *See* § 43-2-3. Under New Mexico law the City has the authority to create and implement the CSA program. Additionally, NCI provides treatment under the Act.

Therefore, the City respectfully asks the Court to declare its policies and procedures, as described herein, legal pursuant to established New Mexico law, including the DRA.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue as to any material fact exists and the movant is entitled to judgment as a matter of law. Rule 1-056 NMRA; *State v. Integon Indem. Corp.*, 1987-NMSC-029, ¶ 4, 105 N.M. 611, 735 P.2d 528. Trial courts view the evidence in the light most favorable to the opposing party. *Id.* Summary judgment serves to "hasten the administration of justice and to expedite litigation by avoiding needless trials and to enable one promptly to obtain a judgment." *Martinez v. Metzgar*, 1981-NMSC-126, ¶ 5, 97 N.M. 173, 637 P.2d 1228 (internal quotation marks omitted).

## III.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### The Gallup Police Department and its Community Service Aides

1.    "The Primary Mission of the Gallup Police Department (GPD) includes the protection of life and property . . . ." *Mission Statement*, GPD Rules and Procedures (effective Sep. 15, 2004), attached hereto as Exhibit 5.

2.    The Gallup Police Department Community Service Aide Program was "established to respond to and handle non-emergency, non-life threatening calls for service, calls regarding

4

persons impaired by alcohol or drugs, thereby enabling certified officers to dedicate a greater amount of time to proactive enforcement and in-depth investigation of criminal and traffic related offenses." *Community Service Aide Program*, GPD Rules and Procedures, at Rule 115.00 (effective Jan. 22, 2014), attached hereto as Exhibit 6.

3.     The general purpose of a CSA is to "Protect life and property through the enforcement of federal, state and local laws dealing with protective custody . . . ." *Community Service Aide*, City of Gallup Job Description, (7/28/15), attached hereto as Exhibit 7.

4.     CSAs patrol assigned areas on foot or by vehicle with the goal of keeping intoxicated individuals safe. *Community Service Aide*, City of Gallup Job Description, (7/28/15), attached hereto as Exhibit 7.

5.     The GPD requires CSAs to promptly obey and support all directives and policies established by Gallup's Chief of Police. *Community Service Aide Program*, GPD Rules and Procedures, at Rule 115.01(A), attached hereto as Exhibit 6.

6.     The GPD assigns a Gallup Police Lieutenant to coordinate the CSA Program and provide oversight to the CSA Program. *Id.* at 115.06(B).

7.     Gallup Patrol Sergeants supervise CSAs. *Id.* at 115.06(A).

8.     The GPD provides CSAs with necessary training. *Id.* at 115.08.

9.     The GPD establishes uniform procedures for selecting individuals for employment as CSAs. *Id.* at 115.07(A).

10.    Such individuals must meet the minimum qualifications listed in the Job Class Specifications. *Id.* at 115.07(B).

11.    CSAs may be dispatched to any call for service within the scope of their responsibility and not otherwise restricted by GPD policy. *Id.* at 115.01(B).

5

12.     CSAs must report the location and nature of crimes in progress to the local communications centers. *Id.* at 115.01(E).

13.     CSAs are required to testify regarding their official duties. *Id.* at 115.01(F).

14.     CSAs are required to "attempt to locate and respond to reports of individuals impaired by alcohol or drugs to the extent that the person's health and well-being are substantially impaired and endangered." *Id.* at 115.02(A).

15.     CSAs are required to "transport impaired individuals to an approved treatment facility." *Id.* at 115.02(B).

16.     CSAs are required to "transport impaired persons in a reasonable amount of time depending on the individual's condition (i.e. elderly, disorderly), weather, or when reasonably necessary." *Id.* at 115.02(C).

17.     CSAs are required to "summon medical personnel for highly intoxicated individuals who are unable to walk as a result of the levels of alcohol or drugs, individuals experiencing a medical illness or emergency, or if the individual has a serious injury." *Id.* at 115.02(D).

18.     CSAs are required to "make a diligent effort to determine whether any disabled person is an epileptic or a diabetic or suffers from some other type of illness that would cause the condition, before transport." *Id.* at 115.02(E).

19.     When determining whether a disabled person suffers from an illness, CSAs are required to "make a reasonable search for any identification device and an identification card and examine them for emergency information." *Id.* at 115.02(F).

20.     CSAs are authorized to, "if the CSA reasonably believes it necessary for the CSA's own safety, make a protective search of an intoxicated person before transport." *Id.* at 115.02(H).

21.     For CSAs, "Protective Custody incidents will take precedence over other activities." *Id.* at 115.02(I).

22.     CSAs are authorized to use force that is "reasonable and necessary to overcome resistance, to protect oneself or another, and to effect lawful objectives." *Id.* at 115.09(A).

23.     CSAs are "permitted to use those defensive tactics and non-deadly tools with which they are trained, qualified, and certified . . . as determined by training procedures, for the resolution of incidents when force becomes necessary." *Id.* at 115.09(B).

24.     CSAs are "expected to consider the use of Department approved options, ranging from verbal techniques, hand control procedures, and non-lethal equipment." *Id.* at 115.09(C).

25.     CSA disciplinary procedures go through the GPD chain of command. *Id.* at 115.09(E).

26.     Both CSAs and Gallup certified officers are issued and wear the same Flying Cross Command Uniform Shirts in long and short sleeves, pants, and black duty jackets. Non-certified officers wear the same uniform. *See* Maryann Ustick Affidavit, ¶ 7, attached hereto as Exhibit 8.

27.     CSAs, like all officers, are required to carry their city issued identification cards and identifying badges. *Id.* ¶ 8.

28.     CSA badges are identical to certified officer badges with the exception of the engraving, which for CSAs reads "Protective Custody" and for certified officers reads "Officer." *Id.*

29.     "CSAs and all officers are issued expandable batons, chemical agents, handcuffs, radios, flashlights, belt-keepers, and bullet proof vests." *Id.* ¶ 9.

30.     "The vehicles driven by CSAs are similar to the Gallup police vehicles in that they are painted black and white and have emergency flashing lights installed on the vehicle roofs, and are marked with a distinct vehicle number." *Id.* ¶ 10.

7

31. Vehicles driven by both CSAs and officers display the markings, "To Serve & Protect," and "www.galluppolice.com." *Id.* ¶ 11. A picture representative of the units driven by CSAs is attached to the affidavit of Maryann Ustick as Exhibit 1A. *Id.* Exhibit 1B to Maryann Ustick's affidavit is a similar CSA unit in the forefront, with a police SUV vehicle in the background. *Id.*

32. The physical agility standard requirements for CSAs are identical to the physical agility standard requirements for officers. *See* Physical Agility Standards for Police Officer & Community Service Aide, attached hereto as Exhibit 9.

33. The City of Gallup pays the salaries of both CSAs and all other officers. *Id.* ¶ 12.

**The Na'Nizhoozhi Center, Inc.**

34. NCI was established in 1992 through joint cooperation of the City of Gallup, McKinley County, the Zuni Tribe and the Navajo Nation. Initially established to provide protective custody services, NCI developed additional services to facilitate the emergency commitment of persons pursuant to the Detoxification Reform Act. Na'nizhoozhi Center, Inc. Policy Manual, excerpt (effective 10/17/07), attached hereto as Exhibit 10.

35. The City contracts with NCI for the operation of the City's detoxification center. *See* Gallup Social Detox and Expanded Shelter and Treatment Services Agreement, ¶ 1 (September 30, 2017), attached hereto and Exhibit 11.

36. NCI provides protective custody services. *Id.* ¶ 1(B).

37. NCI is operated as a treatment facility in compliance with the DRA. *Id.* ¶ 1.

38. A search for "treatment facility" in New Mexico's Behavioral Health Services' service directory, returns NCI as a result. *See* Behavioral Health Collaborative, State of New Mexico, Behavioral Health Services, *available at* http://newmexico.networkofcare.org/mh/services/

advanced-search.aspx?k=treatment+facility## (last visited Aug. 8, 2017), attached hereto as
Exhibit 12.

## IV. BASED ON THE RULES OF STATUTORY CONSTRUCTION, CSAs ARE AUTHORIZED TO ACT UNDER THE DRA

The DRA authorizes "peace officers," "public services officers," and "police officers" to
take actions in furtherance of the Act's objectives and purposes. For example, the DRA provides
that "a peace officer or public service officer may, if the officer reasonably believes it necessary
for the officer's own safety, make a protective search of an intoxicated person before
transporting the person to a residence, treatment facility or detention center." *Id.* § 43-2-19. The
Act further states, "a peace officer or public service officer shall not be held civilly liable for . . .
alleged torts or crimes on account of reasonable measures taken under the authority of the
[DRA]." *Id.* The Act also provides that an intoxicated or incapacitated person may be committed
at the request of an authorized person for protective custody if the authorized person has
reasonable cause to believe that the person is incapacitated by alcohol or drugs or has committed
one of the acts listed in Section 43-2-8(A). *See* § 43-2-8(A). The Act defines an "authorized
person" as a "physician" or a "police officer." Section 43-2-2(B). The Act does not define
"peace officer," "public service officer," or "police officer." *See generally* §§ 43-2-1 to -23.
Chief Hart's principle criticism appears to be that since the DRA does not specifically identify
"CSAs" and because CSAs are "civilian" personnel, they may not undertake any function under
the DRA. *See* Exhibits 3, hereto; *see also* Exhibit B to the City's Complaint for Declaratory
Judgment.

Because the DRA employs the terms "peace officer," "public service officer," and
"police officer," but does not define them, the Court must apply the rules of statutory
construction to determine whether a CSA falls within those definitions. *See State v. Ogden,*

9

1994-NMSC-029, ¶ 23, 118 N.M. 234, 880 P.2d 845 ("While this is probably due to legislative oversight, the fact that there is no directly applicable definition for 'peace officer' in the aggravating circumstances statute turns our focus to rules of statutory construction."). Statutory interpretation is an issue of law subject to de novo review. *See State v. Tufts*, 2016-NMSC-020, ¶ 3, __ P.3d __. "The principal command of statutory construction is that the court should determine and effectuate the intent of the legislature . . . ." *Ogden*, 1994-NMSC-029, ¶ 24.

### A. CSAs are "peace officers," "public service officers," and "police officers" for purposes of the DRA based on the plain and ordinary meaning of those terms

Courts "us[e] the plain language of the statute as the primary indicator of legislative intent." *Ogden*, 1994-NMSC-029, ¶ 24 (citations omitted). "The words of a statute, including terms not statutorily defined, should be given their ordinary meaning absent clear and express legislative intention to the contrary." *Id.* ¶ 24. Because the DRA does not define "peace officer," "public service officer," or "police officer," the terms "must be given [their] plain and ordinary meaning." *Id.* ¶ 33.

In *Ogden*, the New Mexico Supreme Court held that Farmington's Community Service Officers ("CSOs") (under a program similar to the CSA Program) are "'peace officers' under the plain and ordinary meaning of the term."[3] *Id.* ¶ 33. The *Ogden* court stated that the plain and ordinary meaning of "peace officer" is "a police officer, sheriff, or other law enforcement official who keeps the peace by patrolling public areas and enforcing the law." *Id.* ¶ 33. As evident from the undisputed material facts above, the general purpose of a CSA is to "Protect life and property

---

[3] In fact, the *Ogden* Court concluded that CSOs were "peace officers" under the aggravated circumstances statute despite the rule of statutory construction unique to criminal statutes that ambiguous statutes are strictly construed and resolved in favor of lenity to the defendant. *See Ogden*, 1994-NMSC-029, ¶ 25. The DRA should be construed less strictly than the statute at issue in *Ogden* because the DRA is a civil statute, which explicitly excludes criminal penalties, Sections 43-2-3, -4, -8(F)&(G), and is thus not subject to the rule of lenity, *e.g.*, *Ogden*, 1994-NMSC-029, ¶ 25.

through the enforcement of federal, state and local laws dealing with protective custody." UMF No. 3. CSAs also have a variety of other peace keeping and law enforcement duties including patrolling the City, reporting crimes, providing testimony about their duties, making protective searches of persons, and using reasonable force when necessary for the protection of others. *See* UMF Nos. 3, 4, 11-23. Thus, as in *Ogden*, CSAs fall under the plain meaning of the term "peace officer."

As explained in *Ogden*, by using the term "peace officer," the DRA "demonstrates the legislature's intention to [include] a broader category of law enforcement officers than only police officers." *See Ogden*, 1994-NMSC-029, ¶ 35. "A court should not hobble statutory interpretation with the requirement that every circumstance meant to be covered must be specifically mentioned in the statute." *Id.* ¶ 35.

The New Mexico Supreme Court decided *Ogden* in 1994, and the Legislature last revised the DRA in 2005. At the time of the 2005 revision, the Legislature knew both that *Ogden* construed the term "peace officers" to include CSOs, and that *Ogden* deemed the Legislature's use of the term "peace officers" as intending to apply to a broad category of law enforcement officers. *See Aguilera v. Bd. of Educ.*, 2006-NMSC-015, ¶ 24, 139 N.M. 330, 132 P.3d 587 (in construing statutes we presume that the legislature was "aware of existing law, including the case law of our appellate courts."); *Ogden*, 1994-NMSC-029, ¶ 35. The fact that the Legislature was aware of the holding in *Ogden* at the time it last revised the DRA further indicates that the Legislature intended that law enforcement personnel like CSAs could be authorized to take reasonable steps under the DRA. Such reasonable steps include transporting and committing impaired persons for their protection.

11

CSAs are also "public service officers" under the plain meaning of that term. "Public service officer" is not defined by the DRA, nor is it defined by our case law. However, "public service" is "a service rendered in the public interest" or "governmental employment." *Public Service*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/public%20service (last visited Aug. 28, 2017). The definition of "officer" is "one charged with police duties" or "one who holds an office of trust, authority, or command." *Officer*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/officer (last visited Aug. 28, 2017). Thus, CSAs are "public service officers" under the plain meaning of the term because as governmental employees they are charged with police duties and hold an office of trust and authority for the purpose of serving the public interest. *See* UMF Nos. 2-31. CSAs accomplish these objectives, in part, by protecting life and property through the enforcement of federal, state and local laws dealing with protective custody. *See, e.g.*, UMF No. 3.

CSAs are similarly "police officers" under the plain meaning of the term. *Cf. Ogden*, 1994-NMSC-029, ¶ 39 ("To determine whether positions are of a law enforcement nature, this Court will look at the character of the principal duties involved . . . ."). Again, the general purpose and duty of the CSAs is the protection of life and property through the enforcement of federal, state and local laws dealing with protective custody. *See* UMF No.3. In addition, "police officer" is defined as "a member of a police force." *Police Officer*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/police%20officer (last visited Aug. 24, 2017). CSAs are "police officers" under the plain meaning of the term because the CSA Program is part of the Gallup Police Department; and CSAs are trained by, and are members of, that Department. *See* UMF Nos. 2, 5-10. The CSA Program's purpose is to protect life and property, directly in line with the mission statement of GPD. *See* UMF Nos. 1, 3. CSAs are

12

required to promptly obey and support all directives and policies established by the Chief of Police, are supervised by Gallup Patrol Sergeants, are coordinated and overseen by an assigned Gallup Police Lieutenant, and follow the GPD chain of command. *Id.* at Nos. 5-7, 25. CSAs also have the same agility standards as officers. *See* UMF No. 32. CSAs patrol the City as members of the Gallup police force, *id.* at Nos. 2, 4-7, and are police officers under the plain meaning of that term.

**B.    CSAs are "peace officers," "public service officers," and "police officers" for purpose of the DRA based on their duties, authority, and appearance**

The *Odgen* Court further held that CSOs were "peace officers" because "the public has been given the impression that CSO's by their uniforms, their vehicles, and their demeanor are qualified and fully trained police officers with the attendant authority and duty to maintain public order." *Ogden*, 1994-NMSC-029, ¶ 33 (holding that based on "CSO's duties, authority, and appearance, CSOs are 'peace officers' under the plain and ordinary meaning of the term."). In Gallup's case, CSAs give the public the same impression by their duties, authority, and appearance. For example, CSA duties include patrolling the City, reporting crime, obeying GPD policies and procedures, locating and transporting individuals in need of protective custody services, determining whether medical assistance is needed and summoning medical personnel if necessary, making protective searches, and assisting citizen's in distress. *See* UMF Nos. 2-4, 11-24. Additionally, CSAs, just like all other officers, are authorized to transport intoxicated individuals to NCI, the City's treatment facility. *See* UMF Nos. 15, 20. CSAs like all other officers are issued expandable batons, chemical agents, handcuffs, radios, flashlights, beltkeepers, and bullet proof vests. *See* UMF No. 29. CSAs and officers are authorized to use defensive tactics and non-deadly tools, and to use reasonable force. *See* UMF Nos. 22-24, 29. CSAs, like other officers, are issued and wear the same Flying Cross Command Uniform Shirts

13

in long sleeve and short sleeve, and pants, as well as black duty jackets. UMF No. 26. Non-certified officers wear the same uniform. UMF No. 26. Moreover, the City pays the salaries of both CSAs and GPD officers. UMF No. 33.

The vehicles driven by CSAs are substantially similar in appearance to the Gallup police vehicles in that they are painted black and white, have emergency flashing lights installed on the vehicle roofs, and are marked with a distinct vehicle number. UMF No. 30. Vehicles driven by both CSAs and officers display the markings, "To Serve & Protect," and "www.galluppolice.com." A picture representative of the units driven by CSAs is attached hereto to Exhibit 8, the affidavit of Maryann Ustick as Exhibit 1A. Exhibit 1B to Exhibit 8 is a similar CSA unit in the forefront, with a police SUV vehicle in the background. UMF No. 31. *See Ogden*, 1994-NMSC-029, ¶¶ 6-7 (discussing the similarities between Farmington's CSO's and police officers including how they are outfitted, supervised, and paid).

Thus, Gallup's CSAs convey to the public an impression that CSAs "by their uniforms, their vehicles, and their demeanor are qualified and fully trained police officers with the attendant authority and duty to maintain public order '" *Id.* ¶ 33. By giving these impressions, and applying *Ogden*'s logic, CSAs are "peace officers," "public service officers," and "police officers" under the plain meaning of those terms.

## C. CSAs are "peace officers," "public service officers," and "police officers" under the DRA because they fulfill and further the purposes of the DRA

CSA are also "peace officers," "public service officers," and "police officers" under the DRA because CSAs fulfill and further the purpose of the Act by assisting in the protection and treatment of alcohol and drug-impaired individuals. New Mexico courts construe statutes "to give effect to their objective and purpose and to avoid absurd results." *State v. Begay*, 2017-NMSC-009, ¶ 9, 390 P.3d 168.

14

While, the starting point of statutory construction is an examination of the plain language used by the Legislature, that rule is merely a means used by courts to seek and effectuate the intent of the Legislature. *See State v. Rivera*, 2004-NMSC-001, ¶¶ 10-12, 134 N.M. 769, 82 P.3d 939. "[A]pplying the plain meaning rule is not always as simple as the statement of that rule may imply," and "often does not end the analysis . . . ." *Id.* ¶¶ 11, 12. Courts do not rely on a "literal meaning of a statute when such an application would be absurd, unreasonable, or otherwise inappropriate." *Id.* ¶ 13.

The DRA, like all statutes, must be construed to further legislative intent by considering "thoughts," not just words, in the context of the statutory scheme. *See, e.g., State v. Office of Pub. Defender*, 2012-NMSC-029, ¶ 54, 285 P.3d 622 (in interpreting statutes, "Words are the beginning, not the end; they serve as portals into the thoughts behind the words [in a statute]. . . ."); *Jordan v. Allstate Ins. Co.*, 2010-NMSC-051, ¶ 15, 245 P.3d 1214 (the "primary goal when interpreting statutes is to further legislative intent"); *Truong v. Allstate Ins.Co.*, 2010-NMSC-009, ¶ 29, 147 N.M. 583, 227 P.3d 73 ("It is the high duty and responsibility of the judicial branch of government to facilitate and promote the legislature's accomplishment of its purpose." (brackets omitted)); *Rivera*, 2004-NMSC-001, ¶ 13 (courts must analyze a "statute's function within a comprehensive legislative scheme" and may not consider subsections "in a vacuum"); *State Bd. of Educ. v. Board of Educ. of Alamogordo*, 1981-NMSC-031, ¶ 14, 624 P.2d 530 ("In ascertaining the legislative intent, we look not only to the language used in [a] statute, but also to the object sought to be accomplished and the wrong to be remedied."); *Roberts v. Southwest Cmty. Health Servs.*, 1992-NMSC-042, ¶ 12, 114 N.M. 248, 837 P.2d 442 (noting that statutes must be construed to promote in their operation and to and to achieve the goals specified by the Legislature); *Derringer v. State*, 2003-NMCA-073, ¶ 8, 133 N.M. 721, 68 P.3d 961 ("A statute

15

should be interpreted to mean what the Legislature intended it to mean, and to accomplish the ends sought to be accomplished by it." (quotations omitted)).

In *State v. Johnson,* , the New Mexico Supreme Court was confronted with the question of whether security guards, employees of Gallup Security Service who provided contractual security guard services to the Gallup-McKinley Count Board of Education, could be considered "employees" of the school board for purposes of Section 30-3-9 which prohibits battery upon "school employee[s]." 2009-NMSC-049, ¶ 2, 147 N.M. 177, 218 P.3d 863. The *Johnson* court recognized that "school employees" included members of a local public school board and public school administrators, teachers, and "other employees" of the board. *Johnson,* 2009-NMSC-049, ¶ 11. However, "other employees" was not defined in the statute and thus the court had to look at other sources to determine the meaning of such employees. *Id.* ¶ 11. The court, adopting the *Ogden* approach, applied the two rules of construction discussed above: the plain meaning rule and the rule that statutes should be construed to further their purpose. *Id.* ¶ 17. This approach led the *Johnson* court to conclude that the ordinary definition of "school employee" includes security guards who are providing services for the school, holding that this definition "promotes the State's articulated policy to make schools safe places for learning." *Id.* ¶ 17.

Similarly, the CSA Program promotes the State's stated purpose of providing treatment and protection to alcohol or drug-impaired individuals. *See* § 43-2-3. CSAs primary purpose is to find and assist these individuals and transport them to NCI for treatment. UMF Nos. 3, 4, 14, 15, 35, 36. The history and background of the DRA further supports this interpretation. As explained in *Correa,* the DRA represents a shift over time by New Mexico's Legislature away from criminalizing intoxication and towards the twin goals of protecting and treating citizens affected by alcoholism or drug addiction. 2009-NMSC-051, ¶¶ 7-15; *see also Rivera,* 2004-

16

NMSC-001, ¶ 13 (considering the statute's history and background to determine legislative intent and purpose). Gallup's CSA Program fulfills and furthers the stated purpose of the Act and the ends sought to be accomplished by it. CSAs patrol the City, assist persons whose health and well-being are substantially impaired or endangered, and transport them to NCI if necessary. *See* UMF Nos. 14-18. At NCI, those individuals are protected and can obtain treatment services including protective custody. *See* UMF Nos. 34-38; *see also* § 43-3-3(L) (defining "treatment" as including "protective custody"). The ordinary definitions of "peace officer," "public service officer," and "police officer" include CSAs, who provide transportation and access to treatment for alcohol-impaired individuals. These definitions promote the State's articulated purpose of affording protection and treatment to alcohol impaired individuals.

In sum, CSAs fall under the plain meaning of the terms "peace officer," "public service officer," and "police officer." CSAs exhibit, by their duties, authority, and appearance, that they have the authority of police officers. CSAs and the CSA program fulfill and further the purpose of the Act, which is to afford treatment and protection to individuals whose health and well-being are substantially impaired or endangered by alcohol or drug intoxication. Under the DRA, this includes protective custody.

## V. THE CITY OF GALLUP HAS THE AUTHORITY TO CREATE THE CSA PROGRAM

The City of Gallup has the authority to create and implement the CSA program so long as doing so is not inconsistent with state law. *See* NMSA 1978, § 3-17-1 (1993); *see also Stennis v. City of Santa Fe*, 2008-NMSC-008, ¶ 21, 143 N.M. 320, 176 P.3d 309. The CSA program "does not conflict with state law unless [it] permits an act the general law prohibits, or vice versa." *Stennis*, 2008-NMSC-008, ¶ 21. The CSA program does not conflict with state law for two independent reasons. First, because CSAs are peace officers, public service officers, and police

17

officers under the DRA, as described above in Section IV. Second, because the DRA does not prohibit CSAs from transporting intoxicated individuals to the treatment facility. *See generally* §§ 43-2-1 to -23.

Interestingly, the DRA *does* contain a subsection explicitly outlining prohibitions directed at municipalities. *See* § 43-2-4. This subsection expressly prohibits municipalities from creating ordinances, resolutions, or rules that make being intoxicated an element of an offense giving rise to criminal or civil penalties or sanctions. *See* § 43-2-4(A). However, this subsection does not limit the types of persons municipalities can authorize to transport intoxicated individuals or take other reasonable steps under the Act. *See* § 43-2-4; *see also Rivera*, 2004-NMSC-001, ¶ 16 ("[W]e look not only to what is explicitly stated by the language of [the Act at issue] but we also take special notice of what has been omitted from the purview of the statute."). Because the Legislature has not limited Gallup's authority to create the CSA Program to facilitate its compliance with the goals and objectives of the DRA, or to use its CSAs to transport and assist intoxicated individuals, the CSA Program is lawful under New Mexico law.

## VI.    NCI IS A "TREATMENT FACILITY" UNDER THE DRA

The City of Gallup believes that Chief Hart may also claim that NCI is not a "treatment facility" under the Act, and thus alcohol-impaired persons may not be transported there for protective custody purposes. However, the DRA specifically states that a "treatment facility" is one that provides **treatment** of alcohol impaired persons. *See* § 43-2-2(M). The DRA provides that "treatment" includes a "broad range of emergency, outpatient, intermediate and inpatient services and care, *including protective custody* . . . ." Section 43-2-2(L) (emphasis added). Thus, NCI is a "treatment facility" because it provides protective custody as a service, which constitutes "treatment" as defined by the DRA. *See* UMF No. 36; *see also State v. Tsosie*, 2011-

18

NMCA-115, ¶ 26, 150 N.M. 754, 266 P.3d 34 (determining that the Four Winds Protective Custody Unit was a "treatment facility" under the DRA).

Additionally, the State of New Mexico considers NCI a "treatment facility." For example, a search for "treatment facility" in New Mexico's Behavioral Health Services' service directory, returns NCI as a result. *See* UMF No. 38. NCI provides treatment to intoxicated individuals pursuant to the DRA, and therefore the City lawfully transports such individuals to NCI under the Act.

## VII. CONCLUSION

For the reasons stated herein, the City of Gallup respectfully requests that the Court rule in its favor and affirm that Gallup's Community Service Aide Program as reflected in GPD Rule 115.00 is lawful under the DRA and New Mexico law. The City further respectfully requests that the Court find that CSAs fall under the plain meaning of the terms "police officer," "peace officer," and "public service officer" as used in the DRA, and thus are authorized to act, and make written applications for commitment, under the Act.

Respectfully Submitted,

STELZNER, WINTER, WARBURTON,
FLORES, SANCHEZ & DAWES, P.A.
P.O. Box 528
Albuquerque, New Mexico 87103
Phone: (505) 938-7770


By: */s/ Rebekah A. Gallegos*
JUAN L. FLORES
REBEKAH A. GALLEGOS
***Attorneys for Plaintiff City of Gallup***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was submitted for e-filing and service through the District Court's "Odyssey File & Serve" filing system this 2nd day of November, 2017, which caused the following counsel of record to be served by electronic means or as otherwise stated, as more fully reflected on the Notification of Service:

JoHanna C. Cox
[johanna@johannacoxlaw.com]
Attorney at Law
5901 J Wyoming Blvd NE
Albuquerque, NM 87109

Jeffrey L. Baker [Jeff@thebakerlawgroup.com]
Renni Zifferblatt [Renni@thebakerlawgroup.com]
The Baker Law Group
20 First Plaza NW, Suite 402
Albuquerque, NM 87107

*/s/ Rebekah A. Gallegos*
Rebekah A. Gallegos