STATE OF NEW MEXICO
COUNTY OF MCKINLEY
ELEVENTH JUDICIAL DISTRICT COURT

JEREMY GAY, as the Wrongful Death Personal
Representative of the ESTATE OF RODNEY LYNCH
and RHONDA LYNCH, INDIVIDUALLY,

        Plaintiffs,

  vs.                  D-1113-CV-2020-00359

JUSTIN OLVERA, in his individual capacity,
ELIJAH BOWMAN, in his individual capacity,
NICOLA MARTINEZ-COLLINS, in her individual
capacity, CITY OF GALLUP, a Municipal
Corporation of the State of New Mexico, and
GALLUP POLICE DEPARTMENT, ACTING CHIEF OF POLICE,
FRANKLIN BOYD,

        Defendants.

**DEPOSITION OF STEVEN COLLINS**
May 5, 2021
8:40 a.m.
210 South Second Street
Gallup, New Mexico 87301

    PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE this deposition was:

TAKEN BY:    WILLIAM R. KEELER, ESQ.

REPORTED BY:    KIM KAY SHOLLENBARGER, RPR
                NEW MEXICO CCR#236
                PAUL BACA PROFESSIONAL COURT REPORTING
                500 4th STREET, NORTHWEST, SUITE 105
                ALBUQUERQUE, NEW MEXICO 87102

Exhibit "H"

1  Q. (Mr. Keller) And the manner of death they found as a
2  homicide, would you have any reason to disagree with that?
3       MR. ISAACSON: Objection, foundation. You can
4  answer.
5  A. No, I don't disagree if that's what the report says.
6  Q. (Mr. Keller) Moving on. The transcriptions of IA
7  interviews, what is that?
8  A. It was the interviews of Elijah Bowman and Mr. Olvera.
9  I listened to the recordings of their interviews with whoever
10 the IA was at the time. I'm not sure who they were
11 questioned by.
12 Q. And you said you listened to the interviews.
13 A. No, just the transcription, what was printed out.
14 Q. What they printed out, okay. Did you happen to review
15 anything from the State Police, their reports?
16 A. No, I did not.
17 Q. Why is that?
18 A. It wasn't made available to me.
19 Q. It says up here, "review date 10/1 through 10/7/19."
20 Explain to me why it took six days to review everything.
21 A. Captain Padavich gave us the case. So when he said,
22 "just be done with the review within a week, look over the
23 findings," I reviewed it within that time.
24 Q. When he says, "to review everything," how does he
25 present the case to you to review?

1  A. I think he gave us a binder to look at, which did have
2  the CD of the footage from the officers units, and detox, the
3  autopsy report, transcriptions of the IA, IA interviews.
4  Q. Was there anything else that you recall on the disk?
5  A. I don't recall.
6  Q. Your conclusions, you said, "Justin Olvera was at the
7  Gallup detox to back up another due to a violent subject."
8  Did I read that correctly?
9  A. The second paragraph?
10 Q. I'm looking at the second sentence. I'm just looking
11 at the conclusions you came up with, starting with that.
12 A. Yes.
13 Q. Why did you call him a violent subject?
14 A. Well, it was reported that Elijah Bowman had requested
15 him to the scene through the use of a telephone because the
16 guy, I guess, passively resisted him at the mall, from what I
17 recall. Watching the video from -- again, this is drawing my
18 conclusion. But the male subject that he had taken to Gallup
19 detox was hitting in the cage and things like that.
20 Q. Is that uncommon?
21 A. It's not uncommon. When that usually happens officers
22 try to call each other for backup.
23 Q. So that wasn't a unique situation, him hitting the van?
24 A. No, it occurs frequently.
25 Q. Correct me, PSA is what they're called now?

1  A. PSOs.
2  Q. PSOs, okay. And that's something that PSOs have to
3  deal with?
4  A. They do.
5  Q. So it wasn't a surprise for him to be pounding on the
6  van?
7       MR. ISAACSON: Objection, foundation and form. Go
8  ahead.
9       MR. BECKER: Same objection. I'll join.
10 A. No, it wouldn't be.
11 Q. (Mr. Keeler) It doesn't surprise you in any way that
12 somebody would do that in the back of a van?
13      MR. ISAACSON: Objection, form. You can answer.
14 A. No, it doesn't surprise me.
15 Q. (Mr. Keeler) You go on to say, "the subject physically
16 passively resisted Officer Bowman at the mall." Where did
17 you get that information from?
18 A. I believe it was the, I believe it was the incident
19 report, I believe. I guess he didn't want to get in the van,
20 that's why he had called an officer there to help him.
21 Officer Roanhorse went there to assist. I believe there was
22 no incident anymore, they were able to get him to the van.
23 Q. When you say, "the incident report," was that part of
24 what you reviewed to come up with your Document A?
25 A. I don't recall if it was an incident report or an IA

1  transcription, I don't recall which one it was.
2  Q. But it would have been part of that disk that you were
3  given --
4  A. It was actually a binder.
5  Q. Were you all given the same binder?
6  A. I believe so.
7  Q. Going on, it says, "and made threats to Elijah Bowman."
8  How did you learn that he had made threats to Elijah Bowman?
9  A. I don't recall. I don't recall.
10 Q. "Olvera felt the need to assist Elijah Bowman." How
11 did you come up with that conclusion?
12 A. Through the transcription, or the incident reports. I
13 don't recall, but it was made known that Bowman had actually
14 called Olvera, or texted him with his cell phone, and said he
15 wanted help to unload the male from the back of the van at
16 the Gallup detox center.
17 Q. Is that something that commonly happens, the PSOs will
18 call each other for help?
19 A. Yes, they frequently do. They call officers as well.
20 Q. Is there a reason why one would call an officer as
21 opposed to a PSO to help them?
22 A. Well, now it is within policy. If there's a violent
23 subject, a combative subject, we have to respond with an
24 officer. An officer has to respond with them.
25 Q. When was that policy put in place?

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102