STATE OF NEW MEXICO
COUNTY OF MCKINLEY
ELEVENTH JUDICIAL DISTRICT COURT

JEREMY GAY, as the Wrongful Death Personal
Representative of the ESTATE OF RODNEY LYNCH
and RHONDA LYNCH, INDIVIDUALLY,

        Plaintiffs,

  vs.                      D-1113-CV-2020-00359

JUSTIN OLVERA, in his individual capacity,
ELIJAH BOWMAN, in his individual capacity,
NICOLA MARTINEZ-COLLINS, in her individual
capacity, CITY OF GALLUP, a Municipal
Corporation of the State of New Mexico, and
GALLUP POLICE DEPARTMENT, ACTING CHIEF OF POLICE,
FRANKLIN BOYD,

        Defendants.

==DEPOSITION OF MATTHEW GRAHAM==
May 5, 2021
3:20 a.m.
210 South Second Street
Gallup, New Mexico 87301

      PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE this deposition was:

TAKEN BY:    WILLIAM R. KEELER, ESQ.

REPORTED BY:    KIM KAY SHOLLENBARGER, RPR
                 NEW MEXICO CCR#236
                 PAUL BACA PROFESSIONAL COURT REPORTING
                 500 4th STREET, NORTHWEST, SUITE 105
                 ALBUQUERQUE, NEW MEXICO 87102

Exhibit "I"

1 promoted as sergeant last April.
2 Q. April 2020?
3 A. Yes, sir.
4 Q. What does your job entail now as a sergeant?
5 A. Supervision. I am the immediate supervisor of my
6 shift, which is out there right now.
7 Q. We'll try to be quick and get you back out there,
8 unless you want me to go slow.
9 A. No, quick is fine. I'm just a little worried they're
10 going to get into a pursuit right now.
11 Q. Do you know why you are here today?
12 A. I do.
13 Q. Why is that?
14 A. For a use of force incident over at Gallup detox
15 facility NCI involving Mr. Justin Olvera.
16 Q. Do you recall reviewing the incident as a Response to
17 Resistance Board Member?
18 A. Yes, I do.
19 Q. If you could review that for me. Have you had a chance
20 to review it?
21 A. Yes, sir.
22 Q. What exactly did you review before making your report?
23 A. I was given the opportunity to watch the video from the
24 Gallup detox camera.
25 Q. Anything else?

1 A. There were a packet of statements, I think.
2 Q. Do you remember who made the statements?
3 A. I think they were written per the officers on what
4 happened, the CSA, officers, sergeant, on what happened. I
5 don't remember exactly what they said.
6 Q. Like a packet?
7 A. Yes.
8 Q. Was it something like this?
9 A. No, it was more put together, I believe.
10 Q. Whatever was in the packet is what you reviewed?
11 A. That I read, yes, along with the videos.
12 Q. Anything else, besides what was in the packet and the
13 videos?
14 A. Not that I can recall.
15 Q. I'm looking at your report. It says, "it has been
16 determined that PSO Justin Olvera has been found to be in
17 violation of excessive force against Mr. Rodney Lynch at the
18 NCI detox center." Did I read that correctly?
19 A. Yes, sir.
20 Q. What did you base that upon?
21 A. I based that on the fact that the tactics used were not
22 tactics taught. It is not through the mini academy that they
23 go through, which is a portion of educational classes that
24 range from defensive tactics to like case law, things they
25 need to know. The tactics that I taught him to use to do

1 hands-on control of a subject, he did not utilize in his
2 situation with Mr. Lynch.
3 Q. Anything else?
4 A. No. I mean, we teach disengagement, we teach
5 transition. One of the main things of our tactics,
6 especially MACH techniques, which is Mechanical Advantage
7 Control Hold.
8 Q. Is that M-A-C-H?
9 A. Yes. That is taught with different techniques, because
10 it's going to fail, which you transition to another one,
11 because if you go one way, they resist and it's not working,
12 you go another way to take the momentum. So if one thing is
13 not working you need to move to the next.
14 Q. Three lines down, at the end of the third line, you
15 typed out, 'but there are other options that could have been
16 utilized.' What did you mean by that sentence?
17 A. You don't want to go into front control, that is never
18 taught with us. The end result, as I stated in here, as well
19 as handcuffing procedures, getting them handcuffed, that's
20 the end result. Get them handcuffed, you sit them up, as I
21 teach in my class, to make sure they're all right. You
22 assess their injuries, you ask them if they're fine, more
23 than likely you're going to get like a rude comment, like
24 F-you. You get them help either way. There are options, not
25 just a hold in one position. You've got to move around.

1 Q. And that's what you meant by the other options you just
2 described as other options. Was there anything else besides
3 what you just described?
4 A. No, pretty much that's it. You have them in a prone
5 down position in handcuffing, that's where everything leads
6 to, that's what you want, get them handcuffed, sit them up.
7 Or disengagement, that's another one.
8 Q. Explain disengagement to me.
9 A. Disengagement, get off, let them go, gain distance,
10 call somebody else for assistance. If you to need outnumber
11 the person, gain some sort of compliance because there's too
12 many.
13 Q. And that should have been done in this situation with
14 Mr. Lynch?
15 A. Yeah.
16 Q. Is that yes?
17 A. Could have, should have. Detox could have helped.
18 There were numbers there.
19 Q. You indicate six lines down, choke holds are not taught
20 in defensive tactics portion of the Gallup Police
21 Department's curriculum. Why did you put that sentence in
22 there in your report?
23 A. Because that is iterated time and time again, that
24 choke holds are not taught. I state that to my students,
25 I've always stated that to my students, that is something

## Page 10

1 that is frowned upon, for years. We do not teach it.
2 Q. And your opinion, was a choke hold applied to
3 Mr. Lynch?
4 A. From my point of view, I couldn't really say whether or
5 not there was an actual grip given on there. I know there
6 was an arm underneath, there was a sprawl. I can't really
7 determine without a better view of the camera to say if there
8 was a tight grip.
9 Q. What led to the violation of excess force?
10 A. The failure to transition. I mean, the outcome of the
11 incident, that's what I'm basing it all off of.
12 Q. Outcome of the incident, what do you mean by that?
13 A. I mean, Mr. Lynch was unconscious at one point. They
14 had to roll him over and give him CPR.
15 Q. How about leading to his death?
16 A. I haven't really seen the OMI results. I don't know
17 what the total review on that is. I'm not a medical
18 professional, I can't really determine...
19 Q. Would it surprise you if they listed the manner of
20 death as a homicide?
21 A. It is what it is. It wouldn't really surprise me.
22 Q. I'm going to hand you what's been marked as Exhibit I,
23 and it's going to be the report you did for Officer Bowman.
24 A. Okay.
25 Q. Do you recognize the report?

## Page 11

1 A. Yes, sir.
2 Q. Can you describe to me what your conclusions were in
3 regards to how Mr. Bowman responded to the incident.
4 A. I think he was intimidated, to begin with.
5 Responsibility, as I stated before, are things that you need
6 to do. Do you want me to describe areas of responsibility?
7 Q. Sure.
8 A. Areas of responsibility are, finding work done to help
9 assist in the handcuffing of a subject. So arms are the
10 standard beginning point to handcuff someone. Those are the
11 things that get handcuffed.
12 Q. Is that one of the biggest issues you found in your
13 report for Officer Bowman?
14 A. Yes.
15 Q. What other issues did you find with how he handled the
16 situation?
17 A. He didn't assist in handcuffing. He didn't assist in
18 evaluating the scenario for policy. You have to be able to
19 tell the other officer when to stop. I think he didn't --
20 there was no end result with the handcuffing procedure.
21 Handcuff, sit up, assess.
22 Q. Do you have an opinion one way or another that he
23 should have called a police officer as opposed to texting
24 Olvera to help him at NCI?
25 A. Yes. As chain of command.

## Page 12

1 Q. What is that opinion? Say that again.
2 A. There's chain of command.
3 Q. Explain that to me.
4 A. Chain of command is that they have to move up the basic
5 hierarchy of the police department, should have done it over
6 the radio, to give awareness to the whole shift. And if
7 there was assistance needed the supervisor would have known
8 it at the time on what the scenario was so there could have
9 been some sort of immediate reaction to response.
10 Q. How about the incident at J.C. Penney that kind of led
11 to everything with Officer Roanhorse showing up?
12 A. Officer Roanhorse could have possibly followed him to
13 detox, unless Officer Roanhorse deemed that Elijah Bowman
14 could have handled it on his own.
15 Q. And that would be something that the officer and Bowman
16 would have discussed?
17 A. Should have.
18 Q. Anything else that stands out in your report regarding
19 Bowman, that you're looking at?
20 A. No. I think there's a lot of stuff here that I've
21 already stated for transitioning through different
22 techniques, disengagement. I don't know what you're asking
23 me.
24 Q. Based on the report is there anything you would add to
25 it, Bowman's report?

## Page 13

1 A. I think I was more thorough with his.
2 Q. Is there a reason why one was more thorough than the
3 other?
4 A. I think it was a time factor when I reviewed them.
5 Q. Anything you would add to PSO Olvera's report?
6 A. I don't think I would, other than transitioning through
7 techniques and disengagement.
8 Q. In terms of what he could have done as opposed to what
9 he did?
10 A. Yes.
11 MR. KEELER: I have no further questions. I'll pass
12 the witness.
13 MR. ISAACSON: Mr. Becker may have some questions.
14 EXAMINATION
15 BY MR. BECKER:
16 Q. Officer Graham, you're now a sergeant?
17 A. Yes, sir.
18 Q. My name is Robert Becker, I represent Justin Olvera. I
19 have a couple of questions for you. When he, and I'm
20 referring to Officer Olvera, he was trying to get him
21 handcuffed; isn't that true?
22 A. I did not see that in the video. What I saw was a
23 sprawling to a front headlock of sorts.
24 Q. Did you read his report where he indicated he was
25 trying to get control of his hands?

## Page 22

1  A.  Yes.
2  Q.  Because he was telegraphing confrontation shouldn't an
3  officer have been called to NCI as opposed to Olvera?
4  A.  Oh, absolutely.
5  Q.  Why is that?
6  A.  The officer is more legally liable, per the state, to
7  handle that type of circumstance, and it should have been
8  called out over the radio, I have a 204 subject in the back
9  of my panel, I would like officer assistance from the mall to
10 detox.  That's long enough time.
11 Q.  By long enough time, you mean the drive from the mall
12 to the detox would have given an officer enough time to get
13 to the detox center?
14 A.  Yes.
15 Q.  In terms of choices, could Olvera have made better
16 choices in terms of how he handled the situation?
17 A.  Everybody could have made better choices that day.
18 Q.  As you sit here today is it still your opinion that
19 there was a violation of excessive force against Mr. Rodney
20 Lynch at the NCI?
21 A.  Once again, going by what I taught, per the policy --
22     MR. BECKER:  Objection to form.  Objection, form.
23 You can answer.
24 A.  How I train the new coming officers, it is not a part
25 of anything that we taught.  That's what I base my review on.

## Page 23

1  MR. KEELER:  Thank you, Sergeant.
2  MR. ISAACSON:  Anything else, Bob?
3  MR. BECKER:  No, I'm through, thank you very much.
4  MR. ISAACSON:  We will read and sign.
5  (Deposition concluded at 3:50 p.m.)

## Page 24

STATE OF NEW MEXICO
COUNTY OF MCKINLEY
ELEVENTH JUDICIAL DISTRICT COURT
JEREMY GAY, as the Wrongful Death Personal
Representative of the ESTATE OF RODNEY LYNCH
and RHONDA LYNCH, INDIVIDUALLY,
    Plaintiffs,
            D-1113-CV-2020-00359
JUSTIN OLVERA, in his individual capacity,
ELIJAH BOWMAN, in his individual capacity,
NICOLA MARTINEZ-COLLINS, in her individual
capacity, CITY OF GALLUP, a Municipal
Corporation of the State of New Mexico, and
GALLUP POLICE DEPARTMENT, ACTING CHIEF OF POLICE,
FRANKLIN BOYD,
    Defendants.
         REPORTER'S CERTIFICATE
    I, KIM KAY SHOLLENBARGER, RPR, CCR #236, DO HEREBY
CERTIFY that on May 5, 2021, the deposition of Matthew Graham
was taken before me at the request of, and sealed original
thereof retained by:
    WILLIAM R. KEELER, ESQ.
    Attorney for Plaintiffs
    235 West Historic Highway 66
    Gallup, New Mexico 87301

    I FURTHER CERTIFY that copies of this certificate have
been mailed or delivered to all counsel, and parties to the
proceedings not represented by counsel, appearing at the
taking of the Deposition:

## Page 25

    THOMAS LYNN ISAACSON, ESQ.
    Attorney for Defendants City of Gallup, et al
    104 East Aztec Ave.
    Gallup, New Mexico 87301

    ROBERT W. BECKER, ESQ.
    Attorney for Defendant Justin Olvera
    4908 Alameda Blvd., NE
    Albuquerque, New Mexico 87113

    I FURTHER CERTIFY that examination of this transcript
and signature of the witness was requested by the witness
and all parties present.
    I FURTHER CERTIFY that the recoverable cost of the
original and one copy of the Deposition, including exhibits,
to William R. Keeler, Esq., is $
    I FURTHER CERTIFY that I did administer the oath to the
witness herein prior to the taking of this Deposition; that
I did thereafter report in stenographic shorthand the
questions and answers set forth herein, and the foregoing is
a true and correct transcript of the proceeding had upon the
taking of this Deposition to the best of my ability.
    I FURTHER CERTIFY that I am neither employed by nor
related to nor contracted with (unless excepted by the Rules)
any of the parties or attorneys in this case, and that I
have no interest whatsoever in the final disposition of this
case in any court.
            Kim Kay Shollenbarger, RPR
            New Mexico CCR#236
            License Expires 12/31/2021