STATE OF NEW MEXICO
COUNTY OF MCKINLEY
ELEVENTH JUDICIAL DISTRICT COURT

JEREMY GAY, as the Wrongful Death Personal
Representative of the ESTATE OF RODNEY LYNCH
and RHONDA LYNCH, INDIVIDUALLY,

        Plaintiffs,

    vs.                              D-1113-CV-2020-00359

JUSTIN OLVERA, in his individual capacity,
ELIJAH BOWMAN, in his individual capacity,
NICOLA MARTINEZ-COLLINS, in her individual
capacity, CITY OF GALLUP, a Municipal
Corporation of the State of New Mexico, and
GALLUP POLICE DEPARTMENT, ACTING CHIEF OF POLICE,
FRANKLIN BOYD,

        Defendants.


                DEPOSITION OF NEIL YAZZIE
                    May 5, 2021
                     2:30 p.m.
              210 South Second Street
             Gallup, New Mexico 87301


        PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE this deposition was:


TAKEN BY:    WILLIAM R. KEELER, ESQ.


REPORTED BY:    KIM KAY SHOLLENBARGER, RPR
                  NEW MEXICO CCR#236
                  PAUL BACA PROFESSIONAL COURT REPORTING
                  500 4th STREET, NORTHWEST, SUITE 105
                  ALBUQUERQUE, NEW MEXICO 87102

Exhibit "J"

Page 10

1  got a pretty good group of guys, we all help each other out.
2  Q.  That's good.
3  A.  Yeah, I really can't think of anything right now.
4  Q.  Explain to me what your responsibilities are on the
5  Response to Resistance Board.
6  A.  The Response to Resistance Board, our responsibility is
7  to just review the response to resistance given the instance
8  that we're assigned by Captain Padavich, who is in charge of
9  it. He will assign it to either myself or another one of the
10 members of the board and give them instructions. If it's
11 going to be two individuals or three that are going to review
12 the given incident and we're just only looking at the
13 Response to Resistance Policy, we are not looking at anything
14 else other than what's there in black and white for the
15 Response to Resistance Policy.
16 Q.  Captain Padavich also described it as use of force.
17 A.  Yes, yes. It's what changed from use of force to now
18 response to resistance.
19 Q.  When and you say it's assigned to two people, is
20 Captain Padavich always included with the other two or the
21 other three individuals or is it just luck of the draw of
22 who's going to review a case?
23 A.  Captain Padavich likes to disseminate so that way we
24 all get our fair share. It's not just like one officer
25 that's getting all the -- we call them R2Rs, R2R reports. We

Page 11

1  all get a share of it, so it's not like a -- it's not always,
2  Sergeant Yazzie, you're going to get it. I think there's six
3  of us.
4  Q.  I'll read the names for you. I have Captain Padavich,
5  Lieutenant Collins, Sergeant Spencer, Sergeant Peyketewa,
6  Sergeant Yazzie, Sergeant Graham and Officer Desiderio.
7  A.  Yes.
8  Q.  Is that right?
9  A.  And Officer Deswood.
10 Q.  Deswood?
11 A.  Yes. Nicole Deswood.
12 Q.  Okay.
13 A.  And just to clarify, just for Officer Nicole Deswood,
14 hers is primarily more so if we have a new officer or a
15 female officer that's involved in an R2R incident. Based on
16 the training that we receive some of the incidents have to be
17 within their experience level.
18 Q.  In terms of handing out a review, or a case for you to
19 review, Captain Padavich will call you, email you, whatever
20 it is, but call you and let you know, we have a case for you
21 to review and here's the file? Or how does it work?
22 A.  In the past it was, here's the file, once you're done
23 with the file -- or he would meet with us. We would all get
24 pulled into the room. The two or three that are going to be
25 reviewing it, he would say, here's the file, who's going

Page 12

1  first, we'll get it and then pass it along. Then once we're
2  done we type out our findings and we give that either to the
3  next one. But if we're all done -- like if I was the last
4  one I would give everything back to Captain Padavich and then
5  -- but now it's all through what we call Blue Team. It's all
6  digital documented now.
7  Q.  In terms of the incident that we're here for today
8  concerning Officer Olvera and Mr. Lynch, how did you learn
9  that you were going to be on the review board for that
10 incident?
11 A.  That was the old system where we all met in the
12 conference room and we were told that we would be reviewing
13 this R2R incident.
14 Q.  What do you recall about what you reviewed? And I will
15 give you a copy of your report here. I'll have you take a
16 look at that and let me know when you've had a chance to
17 review it.
18 A.  I've read it over.
19 Q.  It says a review date of October 2, 2019; is that
20 correct?
21 A.  Yes.
22 Q.  It only took you one day to review everything?
23 A.  No, this is the day I typed out my...
24 Q.  What do you recall reviewing in order to come up with
25 your report?

Page 13

1  A.  I reviewed the incident report, I reviewed the
2  surveillance camera footage, I reviewed the interviews that
3  were conducted with the officers involved, basically the
4  whole case file under here, this IA-019-10, that was
5  basically -- that whole file was given to us to review.
6  Again, that was basically to -- our main focus was just on
7  the R2R incident itself.
8  Q.  Say that again.
9  A.  My main focus -- well, my main focus, or anybody on the
10 board is, our main focus is on the response to resistance
11 incident itself.
12 Q.  Is that use of force?
13 A.  Yes.
14 Q.  In looking over your report is there anything in
15 particular that struck you regarding the incident?
16    MR. ISAACSON: Object to form, but you can answer.
17 A.  Can you reclarify that.
18 Q.  (Mr. Keeler) Sure. Just looking through the report, in
19 your first sentence you typed up, "I find that PSO Justin
20 Olvera's actions were not within the Use of Force Policy by
21 administering a choke hold on Mr. Rodney Lynch." Did I read
22 that correctly?
23 A.  Yes.
24 Q.  What did you mean by, were not within the Use of Force
25 Policy?

1  A. It's a move that's not taught. And when we're looking
2  at the response to resistance or use of force, we judge it on
3  two case law, and that's Graham versus Connor and Tennessee
4  versus Garner. Based on those two it didn't meet those
5  criteria.
6  Q. And that's under the case law, say that again, Graham
7  and what was the other one?
8  A. Graham versus Connor, which gives us the underlying
9  basis of response to resistance or use of force. And then
10 Tennessee versus Garner, which gives us the baseline for the
11 use of deadly force.
12 Q. It was your opinion that the actions taken violated the
13 case law that you just described to us?
14 A. Based on what we see there, yes.
15 Q. Just reading down again. You indicated that PSO Olvera
16 states, he did not hear what Mr. Lynch completely said. As
17 Mr. Lynch was exciting the van I saw that he swung his right
18 arm at PSO Olvera intending to grab his left arm to escort
19 him into the facility. Did you happen to have any recordings
20 of what Mr. Lynch was saying to Mr. Olvera?
21 A. We did have it from the van, so you could kind of hear,
22 but it's really muffled, so we're not able to hear very
23 clearly.
24 Q. And you listened to those van recordings?
25 A. Yes.

1  Q. Based on that, that's where you heard him say, "don't
2  mess with my" dot, dot, dot?
3  A. Yes.
4  Q. Could you make out what he was saying?
5  A. No.
6  Q. That's as far as you could get with it?
7  A. Yes.
8  Q. So you came up with a finding of excessive use of
9  force; is that correct? I'm looking at the bottom of your
10 report here.
11 A. Yes.
12 Q. Reading over this report now, was there anything else
13 you would like to add or is it complete?
14 A. I think the only thing I would add was where I put
15 choke hold in quotations, that's coming directly from the
16 report itself in the complaint, because personally -- like I
17 said, I couldn't see where his right arm was based on the
18 video, as indicated in my report, so that's where I should
19 have probably clarified that even more. That's why I put
20 that in direct quote of choke hold.
21 Q. Do you have any reason to believe that that's incorrect
22 in the reports that you referencing?
23 A. I don't know what the others, what their perception
24 was, and that's why we do multiple. For me personally, when
25 I viewed it, I just -- I don't know why, but when it comes

1  down to the complaint, that was one thing that was in there,
2  was the choke hold so that's why I put it in quotes, because
3  that's not coming from me, that's something that was...
4  Q. But you still believe it was an excessive use of force?
5  A. Yes.
6  Q. No reason to back off of your assessment of the entire
7  situation; is that correct?
8  A. That's correct.
9  Q. Do you recall doing a report for Officer Bowman, Elijah
10 Bowman?
11 A. Yes, I did.
12 Q. I'm going to show you what we have marked as Exhibit I,
13 and I'll let you review that.
14 A. I reviewed it.
15 Q. Have you had a chance to review?
16 A. Uh-huh.
17 Q. What is the review date that we have for Officer
18 Bowman?
19 A. September 27, 2019.
20 Q. Is that a good indication that you did a report for
21 Officer Bowman before you did your report for Mr. Olvera?
22 A. Yes.
23 Q. Any reason why you did his before the other one?
24 A. No.
25 Q. Can you read that report into the record for us,

1  please.
2  A. I checked not within policy, could include
3  underutilization of force response options. Comments, based
4  on the statement and video, I found that PSO Elijah Bowman
5  did not use excessive force during the incident involving
6  Rodney Lynch. During both incidents, I saw that PSO Bowman
7  reacted off of Mr. Lynch's actions both times. When applying
8  force at J.C. Penney's, PSO Bowman attempted to utilize a
9  control technique as Mr. Lynch was resisting, but was unable
10 to do so. Mr. Lynch eventually stopped resisting and sat up
11 under his own power. During the incident at Gallup detox, I
12 saw that PSO Bowman tried a deescalation tactic by asking PSO
13 Justin Olvera to process Mr. Lynch into the Gallup detox, but
14 Mr. Lynch appeared to become combative as he exited the van.
15 PSO Bowman's response was not the best tactic by just holding
16 onto Mr. Lynch's waist, but I found that it did not exceed
17 policy under use of force. I recommend additional training
18 for PSO Bowman in defensive tactics, response to resistance,
19 and command presence areas.
20 Q. Thank you. Talking about the incident at J.C.
21 Penney's, I believe you indicated that there was a -- did he
22 use force at J.C. Penney's to get him on the ground?
23 A. He was already on the ground.
24 Q. He was already on the ground.
25 A. Yes.

Page 22

1  Q. Until you were given the file by Captain Padavich you
2  hadn't reviewed it or talked to anybody about the case?
3  A. No.
4     MR. KEELER: No further questions. I'll pass the
5  witness.
6     MR. ISAACSON: Mr. Becker may have some questions
7  for you.
8     EXAMINATION
9  BY MR. BECKER:
10 Q. Sergeant Yazzie, my name is Robert Becker and I
11 represent Justin Olvera and I've just got a couple of
12 questions for you. You mentioned that you reviewed the
13 complaint when you got this file as part of the Response to
14 Resistance Board. What do you mean the complaint, I'm
15 confused?
16 A. Well, the notice --
17 Q. What complaint are you referring to?
18 A. What I meant was the Notice of Review for the review
19 that we were going to be reviewing this particular incident.
20 Q. In that notice that's where you found that there was a
21 conclusion reached that Officer Olvera, PSO Olvera, used a
22 choke hold on Mr. Lynch. Do I have that right?
23 A. Yes, I read it in there and I can't remember where in
24 that file, it was a very thick file. I remember that was one
25 thing that stuck out to me was the, in verbatim, choke hold

Page 23

1  and that's why on my review I put it in quotes. I just can't
2  remember exactly where.
3  Q. Let me ask you this, you looked at the videotapes,
4  right?
5  A. Yes.
6  Q. Could you see from the videotapes whether Justin
7  Olvera, in fact, used a choke hold on Mr. Lynch?
8  A. Again, as I mentioned earlier, I could not tell. The
9  only thing I could see in there was his left arm. As far as
10 where his right arm was positioned, I can't 100 percent be
11 certain where it was positioned.
12 Q. So your finding that there was an excessive use of
13 force is based on a conclusion from the referral that you got
14 that there was, in fact, a choke hold that was used on
15 Mr. Lynch?
16    MR. KEELER: Objection, form and foundation.
17    MR. BECKER: Correct?
18    MR. KEELER: You can answer.
19 A. Yes.
20 Q. (Mr. Becker) That's nothing that you independently
21 concluded from looking at the videotape, just so I'm clear,
22 correct?
23 A. Yes.
24 Q. You mentioned Graham versus Connor and Tennessee versus
25 Garner, what's your understanding of what the holding is in

Page 24

1  Tennessee versus Garner?
2  A. Tennessee versus Garner states that an officer can use
3  deadly force under three conditions and the three conditions
4  are; if the officer is going to be receiving serious bodily
5  injury or death. Number two, if the person of another is
6  going to be receiving serious bodily death or injury, and if
7  the person is a violent felon and flees and has the potential
8  of causing serious bodily injury or death to the person of
9  another.
10 Q. Isn't it true that the old law, before Tennessee versus
11 Garner, is that an officer was allowed to use deadly force on
12 a fleeing felon, right?
13 A. In Tennessee, yes.
14 Q. Tennessee versus Garner essentially held, no, you can't
15 use deadly force on a fleeing felony, you can only use deadly
16 force on a dangerous fleeing felon, is that essentially what
17 the holding of the case was?
18 A. Yes. When it comes to in regards to a fleeing felon,
19 yes.
20 Q. What was your understanding of what the holding is in
21 Graham versus Connor?
22 A. Graham versus Connor comes to what they call the Graham
23 factors and the Graham factors is the severity of the crime,
24 is the officer or person of another going to receive injury
25 from that, and then third is the individual actively

Page 25

1  resisting.
2  Q. Based on what you saw was Mr. Lynch actively resisting?
3  A. Yes.
4  Q. And in the way that he was resisting was there a
5  possibility that Mr. Olvera or Mr. Bowman could have been
6  injured --
7  A. Yes.
8  Q. -- by his resistance?
9  A. Yes.
10 Q. The severity of the crime was, he was brought in for
11 being drunk in public, correct?
12 A. Yes.
13 Q. That's not real severe, is it?
14 A. That's actually not even -- you can go disorderly
15 conduct, but more of it falls under detoxification act of him
16 being intoxicated.
17 Q. But assaulting an officer where the officer could
18 receive a serious injury, that's a severe crime, is it not?
19 A. Can you repeat that, you broke up.
20 Q. But assaulting an officer where there's a possibility
21 that the officer could receive a severe injury, that would be
22 a severe crime under the Graham factors, would it not?
23 A. Yes.
24 Q. Doesn't Graham also say that the reasonableness of a
25 particular use of force must be judged from the perspective